**PENNSYLVANIA OFFICE OF CONSUMER ADVOCATE, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Carnegie Natural Gas Company, et al., Intervenors.**

**Nos. 93–1662, 93–1666.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1997.

Decided Dec. 19, 1997.

Denise C. Goulet, Harrisburg, PA, argued the cause for petitioners, with whom Irwin A. Popowsky, Lawrence F. Barth and John F. Povilaitis were on the briefs. Veronica A. Smith entered an appearance.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent,

1. Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-

with whom Jay L. Witkin, Solicitor, John H. Conway, Deputy Solicitor, and Susan J. Court, Attorney, were on the brief. Joel M. Cockrell, Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

At issue in this case is a claim by the Pennsylvania Office of Consumer Advocate ("Consumer Advocate") and the Pennsylvania Public Utility Commission ("Public Utility Commission") (collectively "petitioners") that the Federal Energy Regulatory Commission ("FERC" or "Commission") erred in approving restructured tariff provisions submitted by Carnegie Natural Gas Company ("Carnegie") under section 5 of the Natural Gas Act ("Act"), 15 U.S.C. § 717d (1994). In particular, the petitioners contend that Carnegie should not be allowed to retain revenues resulting from the pipeline's assessment of penalties against customers, because this will give Carnegie an unjust windfall in revenues. In petitioners' view, FERC should require Carnegie to flow through penalty revenues to customers of the pipeline who are not assessed penalties. The Commission, however, followed established policy in allowing Carnegie to retain penalty revenues. The assumption underlying this policy is that penalties are designed to deter wrongful customer behavior, not generate significant additional sums for a pipeline. FERC saw no good reason to deviate from this policy in the instant case.

On the record at hand, there is no basis upon which to overturn FERC's decision. Accordingly, the petitions for review are hereby denied.

## I. BACKGROUND

### A. Regulatory Background

In Order No. 636,[1] FERC culminated a decade-long effort to revamp its regulations

Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of

to create a more efficient market for natural gas at the wellhead. The principal innovation of Order 636 was the mandatory unbundling of pipelines' sales and transportation services, thereby requiring pipelines to sell gas and transportation services separately and allowing purchasers to obtain only the services they require. *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1125–27 (D.C.Cir.1996) ("*UDC*"), *cert. denied*, —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997); Order No. 636, ¶ 30,939, at 30,404–13; Order No. 636–A, ¶ 30,950, at 30,527–46.

Order No. 636, and its "unbundled" regime, did not come without operational challenges to pipelines. Under the new regulatory regime, pipelines have reduced flexibility to adjust when customers unexpectedly deviate from their shipping schedules, and they cannot easily compensate for imbalances between volumes tendered to the pipeline and taken by a customer. Thus, a pipeline with a limited merchant function facing an overrun might be unable to sustain enough pressure ("line pack") to provide efficient and reliable transportation service to its other customers. *See* Carnegie Natural Gas Compliance Filing, Docket No. RS92–30–000 (Dec. 1, 1992) ("Compliance Filing"), at 35, *reprinted in* Joint Appendix ("J.A.") 35. A customer might also arrange to have tendered to the pipeline more gas than the customer ultimately takes within a specified time-frame. In this scenario, if the pipeline lacks the ability to reduce tenders from other sources of supply or to deliver gas to other points, the pressure build-up on the pipeline could threaten system integrity. *Id.; see generally NorAm Gas Transmission Co.*, 79 F.E.R.C. ¶ 61,126, at 61,543, *reh'g denied*, 80 F.E.R.C. ¶ 61,100 (1997) (describing pipeline's operational problems that result from overruns).

Pipelines had faced related operational problems after the Commission's initial attempt in Order No. 436 to unbundle pipelines' transportation and sales services. *See* Order No. 436, Regulation of Natural Gas

Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 42,408 (1985). Under that earlier order, pipelines filed "open-access" tariffs with the Commission offering to provide transportation service on a non-discriminatory basis. Pursuant to the Commission's regulations authorizing pipelines to propose reasonable operating conditions for open-access service, *see* 18 C.F.R. §§ 284.8(c) and 284.9(c) (1997), pipelines proposed penalty provisions that were designed to deter shippers from abusing their contractual rights to pipeline capacity. The Commission approved scheduling and imbalance penalties where pipelines could demonstrate a need to deter conduct that would undermine system integrity. *See, e.g., El Paso Natural Gas Co.*, 35 F.E.R.C. ¶ 61,440, at 62,066–70 (1986).

In Order No. 636, the Commission anticipated that pipelines would face additional operational problems in connection with the pipelines' heightened transportation function under the mandatory unbundling requirement. The Commission concluded that "[t]he pipeline and its shippers need to fashion reasonable, yet effective, methods such as penalties to deter shipper behavior inimical to the welfare of the system and other shippers." Order No. 636, ¶ 30,939, at 30,424. Order No. 636 thus directed pipelines and shipper customers to work out individual pipeline solutions, to be considered in subsequent pipeline restructuring proceedings. *Id.*

B. *Carnegie's Compliance Filing*

Carnegie owns and operates a natural gas pipeline system in West Virginia and Pennsylvania. On December 2, 1991, Carnegie filed tariff sheets with the Commission to comply with Order No. 636. *See* Compliance Filing, J.A. 1–214. Fearing a loss of operational flexibility as a result of its new, unbundled structure and reduced merchant role, Carnegie proposed to assess penalties against customers whose actions threatened the operational integrity of Carnegie's sys-

Natural Gas Pipelines After Partial Wellhead Decontrol, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939 (1992); *order on reh'g*, Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950 (1992); *order on reh'g*, Order No. 636–B, 61 F.E.R.C.

¶ 61,272 (1992); *aff'd in part, rev'd in part, United Distrib. Cos. v. FERC*, 88 F.3d 1105 (D.C.Cir. 1996) ("*UDC*"), *cert. denied*, —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997); *on remand*, Order No. 636–C, 78 F.E.R.C. ¶ 61,186 (1997).

tem. In particular, Carnegie proposed penalties for violations of Operational Flow Orders—orders, which Carnegie was authorized to issue under the new regime, directing customers to take actions that would help keep the pipeline system in balance. Carnegie also proposed imbalance penalties, to be assessed against customers whose deliveries to the system fail to match their withdrawals, within a five percent overrun or underrun tolerance, where the customers fail to take timely corrective action after notification. *See id.* 34–37.

Shortly after Carnegie's submission, Consumer Advocate filed comments, urging the Commission, *inter alia*, to condition acceptance of Carnegie's filing on a requirement that the company credit back the revenues garnered from penalties to customers who did not engage in wrongful behavior. *See* Pennsylvania Office of Consumer Advocate's Comments and Limited Protest On Compliance Filing, Docket No.RS92–30–000 (Dec. 22, 1992) ("Comments"), at 28–30, *reprinted in* J.A. 242–44. Consumer Advocate argued that Carnegie should not be allowed to retain penalty revenues, because various other provisions of Carnegie's tariff afforded the company full protection against the improper actions of customers. In Consumer Advocate's view, Carnegie's retention of penalty revenues would result in a windfall to the pipeline, at the expense of those customers who bore the risk of degraded service caused by the offending customers. *See id.* at 243–44. Finally, Consumer Advocate argued that the established penalty-retention policy should not be followed under Order No. 636, because the new regime presented greater incentives for pipelines to assess penalties in circumstances beyond those contemplated by the traditional policy. *Id.*

In an order entered on April 22, 1993, the Commission rejected Consumer Advocate's request that *all* penalty revenues be credited to firm customers. *See* Carnegie Natural Gas Company, Docket No. RS92–30–000, "Order on Compliance with Restructuring Rule" (April 22, 1993), 63 F.E.R.C. ¶ 61,103, at 61,645–46 (1993) ("April 1993 Order"). The Commission stated that it was "not convinced that the level of Carnegie's proposed

penalties [was] unreasonable, nor that significant revenues will be generated from penalties." *Id.* The Commission announced, however, that it would revisit the issue in the future should Carnegie recover significant penalty revenues. *Id.* Moreover, the Commission ordered Carnegie to make modifications to its penalty provisions, the details of which are irrelevant to the issues before us, to provide for the crediting of revenues to customers under certain circumstances.

On May 21, 1993, Consumer Advocate and Public Utility Commission requested rehearing of the April 1993 Order. J.A. 302–35. In a subsequent order, the Commission again declined to order Carnegie to credit back all penalty revenues to non-offending customers. *See* Carnegie Natural Gas Company, Docket Nos. RS92–30–001 and –002, "Order on Compliance with Restructuring Rule, Granting Clarification, and Granting and Denying Rehearing" (August 2, 1993), 64 F.E.R.C. ¶ 61,-164, at 62,367–68 (1993) ("August 1993 Order"). The Commission justified its position, as it had in previous decisions addressing the revenue retention issue, "on the assumption that properly designed penalties will be successful in their goal of deterring violations and that therefore penalties will not generate significant revenues." *Id.* at 62,367 (citing, *e.g., Florida Gas Transmission Co.,* 63 F.E.R.C. ¶ 61,160, at 62,070 (1993)). At the same time, the Commission provided clarification regarding Carnegie's application of its penalty provisions to the company's residential and commercial retail customers. *See* August 1993 Order, ¶ 61,164, at 62,367.

Consumer Advocate and Public Utility Commission now seek review of the Commission's April 1993 Order and August 1993 Order, insofar the Commission refused to require Carnegie to credit back all penalty revenues to non-offending customers.

## II. ANALYSIS

In *Western Resources, Inc. v. FERC,* 9 F.3d 1568 (D.C.Cir.1993), the court made it clear that " 'judicial scrutiny under the [Natural Gas Act] is limited to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record.' " *Id.* at 1572 (quoting *Columbia Gas Transmis-*

*sion Corp. v. FERC,* 628 F.2d 578, 593 (D.C.Cir.1979)). The decision went on to point out that, "although 15 U.S.C. § 717r(b) requires that 'the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive,' this is merely a recitation of the 'arbitrary and capricious standard for factual findings.'" *Id.* at 1574 n. 8 (quoting *Tennessee Gas Pipeline Co. v. FERC,* 860 F.2d 446, 452 n. 7 (D.C.Cir.1988)); *Maryland People's Counsel v. FERC,* 761 F.2d 768, 774 (D.C.Cir.1985); *cf. Association of Oil Pipe Lines v. FERC,* 83 F.3d 1424, 1431 (D.C.Cir.1996) ("*Oil Pipe Lines*") (reviewing under arbitrary and capricious standard challenges to FERC's new ratemaking scheme for oil pipeline industry).

Petitioners contend that the Commission's decision allowing Carnegie to retain penalty revenues is not "reasoned," because it (1) provides the pipeline with a perverse incentive to assess penalties; (2) provides Carnegie with windfall profits "over and above the cost of service authorized by the Commission as just and reasonable, in violation of sections 4 and 5 of the Natural Gas Act," Petitioners' Br. at 15; and (3) reflects the Commission's failure to consider and protect consumer interests in accordance with its statutory mandate.

As an initial matter, we note that section 4 of the Act is not seriously at issue in this case. In Order No. 636, the Commission found that certain anti-competitive effects caused by the pipelines' bundled services violated sections 4(b) and 5(a) of the Act. Order No. 636, ¶ 30,939, at 30,405. In fashioning remedies in Order No. 636, however—*i.e.* in imposing the requirement of mandatory unbundling—the Commission acted pursuant to section 5 "to determine the just and reasonable 'rule, regulation, practice and contracts' to be 'observed and in force.'" *Id.* at 30,406 (quoting 15 U.S.C. § 717d(a)); *see also id.* at 30,409; *UDC,* 88 F.3d at 1163 (noting that the Commission "draws its authority in the [Order No. 636] restructuring from § 5, or not at all, as no natural gas company has filed the rate structure which FERC is imposing"). The Commission also indicated that pipelines' filings to comply with the order would come within the purview of section 5. *See* Order No. 636, ¶ 30,-939, at 30,465 ("[A]ll of the pipelines' filings will be compliance filings pursuant to the Commission's findings and rulings in this final rule under section 5 of the Natural Gas Act ... and authorizations granted under ... section 7.").

The gravamen of petitioners' challenge, then, is that section 5 obligated the Commission to order the flow-through of all penalty revenues to Carnegie's non-offending customers. The Commission's general policy, as applied in previous cases, has been to allow pipelines to retain penalty revenues on the theory that the penalties serve only a deterrent function and therefore are unlikely to garner significant revenues. *See, e.g., Northern Natural Gas Co.,* 77 F.E.R.C. ¶ 61,282, at 62,234–35 (1996); *Northern Natural Gas Co.,* 62 F.E.R.C. ¶ 61,075, at 61,430–31 (1993). We find nothing in the current record with respect to Carnegie's compliance filing that required the Commission to abandon this traditional rule. Three factors inform this conclusion. First, petitioners fail to offer *any* evidence that Carnegie has obtained "windfall" revenues as a result of the penalty provisions. Indeed, counsel for the Commission asserted at oral argument, without contradiction, that in 1996—apparently the first year for which information on the levels of penalty revenues recovered by pipelines is generally available—Carnegie collected no penalty revenues whatsoever.

Second, the Commission repeatedly has pledged to monitor the levels of penalty revenues obtained by pipelines and to revisit the retention issue if the revenues should prove to be significant. *See, e.g., Northern Natural,* 62 F.E.R.C. ¶ 61,075, at 61,431; *Florida Gas Transmission Co.,* 63 F.E.R.C. ¶ 61,160, at 62,070 (1993); *Panhandle Eastern Pipe Line Co.,* 61 F.E.R.C. ¶ 61,357, at 62,429 (1992). The Commission and its counsel have reiterated these assurances with respect to Carnegie's penalty provisions, both in the orders under review, *see* April 1993 Order, 63 F.E.R.C. ¶ 61,103, at 61,645–46, and during oral argument before this court. The Commission could revisit the revenue retention issue not only in the context of a section 4 rate filing, *see* 15 U.S.C. § 717c;

Respondent's Br. at 7–8, or in a section 5 proceeding initiated by "the complaint of any State, municipality, State commission, or gas distributing company," 15 U.S.C. § 717d(a); *see also* Respondent's Br. at 29–30, but also in a section 5 proceeding initiated by the Commission's "own motion." 15 U.S.C. § 717d(a).

Finally, the Commission has established accounting mechanisms that will facilitate its tracking of Carnegie's penalty revenues. The Commission asserts, and petitioners do not dispute, that pipelines are obligated under 18 C.F.R. §§ 260.1 and 260.2 to file an annual report that includes a statement of their revenues under Account No. 495 of the Commission's Uniform System of Accounts. *See id.* (setting forth requirement to file "FERC Form No. 2" or "FERC Form No. 2–A"); Respondent's Br. at 8 n.3. That account includes a list of miscellaneous revenue sources, and requires pipelines to keep "in a separate subaccount revenues from penalties earned pursuant to tariff provisions, including penalties associated with cash-out settlements." 18 C.F.R. pt. 201, at 603 (1997). Further monitoring is facilitated by FERC regulations governing submissions by pipelines in rate filings pursuant to section 4 of the Act. Under these regulations, in Carnegie's next rate filing, the pipeline must separately document "revenues and associated quantities received as penalties from jurisdictional customers" and "revenues received from cashouts and other imbalance adjustments." 18 C.F.R. § 154.312(j)(2)(vi); *see also* Respondent's Br. at 7–8. It thus appears undisputed that the Commission will have accounting mechanisms in place to track the levels of penalty revenues garnered by Carnegie.

There appears to be no doubt that *if* Carnegie were to collect substantial penalties, these revenues would not be justified by the pipeline's cost of service. However, in the context of a compliance filing under section 5 of the Act, FERC is not obligated to address a mere hypothetical windfall. The task of rate-setting necessarily requires the Commission to make predictive judgments about the operations and costs of regulated entities. Although the Commission must base these judgments on the evidence before it, the Commission cannot guarantee that the results will be error-free. That over- or under-collections of costs will occur is an accepted feature of the rate-setting regime. *See Associated Gas Distribs. v. FERC,* 898 F.2d 809, 810 (D.C.Cir.1990) (Williams, J., concurring) ("The Commission may not disinter the past merely because experience has belied projections, whether the advantage went to customers or the utility; bygones are bygones.").

Of course, it is possible that the restructuring of the gas industry accomplished by Order No. 636 might re-calibrate the incentives of pipelines with respect to the manner in which they design and assess penalties against shippers. Penalty revenues in the future could prove to be significant for pipelines such as Carnegie. *Cf. NorAm Gas Transmission Co.,* 79 F.E.R.C. ¶ 61,126 at 61,547 n. 13 (1997) (NorAm reported receiving annual overrun penalty revenues totaling $1.8 million); *Williams Natural Gas Co.,* 78 F.E.R.C. ¶ 61,342, at 62,463 n. 28 (1997) (Williams reported receiving $4.6 million in penalties over the 1995–96 winter). Nonetheless, it is for the Commission to determine in the first instance whether, as a policy matter, the mere possibility of revenue gains by Carnegie justifies a prospective requirement that the revenues be credited to customers. On the record at hand, the Commission's judgment allowing Carnegie to retain penalty revenues is unassailable.

In other rate-setting contexts, the court has rejected challenges to agency decisions not to implement offsets to account for future revenue gains by regulated entities where the record failed to demonstrate that such revenue gains would occur. In *Oil Pipe Lines,* for example, shipper petitioners contended that the inflation index adopted by the Commission for the price ceiling on oil pipeline rates failed to contain an adequate offset for future productivity gains by the pipelines. *See* 83 F.3d at 1437. The court upheld the indexing formula, noting that petitioners wrongly attributed an offset for productivity gains to the formula. The court further explained that, "[a]s there was no evidence in the record of productivity gains for oil pipelines, the Commission's decision

not to adopt a productivity offset was reasonable." *Id.* Similarly, in *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151 (D.C.Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996), the court held that the Federal Communications Commission, in establishing a rate cap formula for cable companies, reasonably declined to include offsets either for advertising revenues, which "fluctuate[d] greatly" and hence would be "administratively burdensome to incorporate . . . into the rate-making process," or for productivity gains, for which there was "no . . . evidence . . . in the present record." *Id.* at 172–73.

 Counsel for petitioners suggested at oral argument that the Commission's authority to order refunds under section 4 warranted a prospective requirement that Carnegie flow through all penalty revenues to customers. Under petitioners' theory, the Commission's obligation to prevent a pipeline's "unjust enrichment" through penalties parallels the Commission's obligation to direct the payment of refunds "at the earliest possible moment" whenever they "are found due." *FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 155, 83 S.Ct. 211, 216–17, 9 L.Ed.2d 199 (1962); Petitioner's Br. at 25.

Petitioners' theory resting on section 4 is a non-sequitur. As indicated above, the Commission reviewed Carnegie's compliance filing pursuant to section 5; and the Commission does not have authority to order refunds under section 5. *See* 15 U.S.C. § 717d(a) (section 5 allows FERC to "determine the just and reasonable rate . . . to be *thereafter* observed and in force") (emphasis added); *Western Resources*, 9 F.3d at 1581 (citing cases). It simply is not in the nature of a section 5 proceeding to account for every potential revenue gain by a pipeline that might later be deemed to violate the Act's just and reasonable mandate.

 Even if we were to indulge the theory that section 4 principles are applicable to this case, this would not ensure a remedy for petitioners. Refunds under section 4 are discretionary, not mandatory, so any claim for such relief would still be subject to question. *See Western Resources*, 9 F.3d at 1581; *Belco Petroleum v. FERC*, 589 F.2d 680, 686

(D.C.Cir.1978). In *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67 (D.C.Cir.1992), in rejecting the argument that the Commission violated the filed rate doctrine by withholding refunds after it discovered that a utility imposed charges not in conformity with its rate schedules, the court said: "Any assessment of the Commission's refusal to order a refund . . . must . . . be based upon a considered analysis of the facts of [the] case and the precise purposes of the filed rate doctrine and the rule against retroactive ratemaking." *Id.* at 75. Moreover, in holding that FERC did not otherwise act unreasonably in denying the refunds, the court in *Towns of Concord* noted that "[t]he agency need only show that it considered relevant factors and struck a reasonable accommodation among them, and that its [decision] was equitable in the circumstances of this litigation." *Id.* at 76 (internal quotations and citations omitted). Thus, petitioners' argument that the Act's just and reasonable mandate in section 4 requires the flow-through of penalty revenues is without merit.

### III. CONCLUSION

For the foregoing reasons, the petitions for review are denied.