United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 27, 1998 Decided March 17, 1998 

 No. 93-1705

 Georgia Industrial Group, 

 Petitioner

 v.

 Federal Energy Regulatory Commission, 

 Respondent

 South Georgia Natural Gas Company, et al., 

 Intervenors 

 Consolidated with

 Nos. 94-1056 and 94-1272

 

 On Petition for Review of Orders of the 

 Federal Energy Regulatory Commission

 Edward J. Grenier, Jr. argued the cause for petitioner, 
with whom Gail S. Gilman was on the briefs.


 Susan J. Court, Special Counsel, Federal Energy Regula-
tory Commission, argued the cause for respondent, with 
whom Jay L. Witkin, Solicitor, John H. Conway, Deputy 
Solicitor, and Joel M. Cockrell, Attorney, were on the brief.

 Before: Ginsburg, Randolph and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: The Georgia Industrial Group 
("GIG") 1 petitions for review of four orders of the Federal 
Energy Regulatory Commission ("Commission") 2 that ap-
prove tariff revisions filed by the South Georgia Natural Gas 
Company ("South Georgia") 3 to implement Order No. 636.4 

__________
 1 The Georgia Industrial Group is an association of Georgia and 
Alabama industrial users of natural gas obtained or transported 
through the South Georgia Natural Gas Company pipelines.

 2 South Georgia Natural Gas Co., 63 F.E.R.C. p 61,190 (1993) 
("First Order"), reh'g granted and denied, 64 F.E.R.C. p 61,251 
(1993) ("Second Order"), reh'g granted and denied, 65 F.E.R.C. 
p 61,265 (1993) ("Third Order"), reh'g denied, 66 F.E.R.C. p 61,112 
(1994) ("Fourth Order").

 3 South Georgia operates an 831 mile gas pipeline that extends 
from a single receipt point at its interconnection with Southern 
Natural Gas Company in Alabama to 68 delivery points in Georgia 
and Florida. See First Order, 63 F.E.R.C. p 61,190 at 62,420. 
Prior to Order No. 636, South Georgia became a transportation-only 
pipeline on May 5, 1992, following customer conversions from firm 
sales to firm transportation. See id. It provides both firm trans-
portation service and interruptible transportation service to its 
customers. See id.

 4 Order No. 636, Pipeline Service Obligations and Revisions to 
Regulations Governing Self-Implementing Transportation Under 
Part 284 of the Commission's Regulations, and Regulation of 
Natural Gas Pipelines After Partial Wellhead Decontrol, F.E.R.C. 
Stats. & Regs. p 30,939 (1992), order on reh'g, Order No. 636-A, 


The revisions added a pre-granted abandonment requirement 
and a right-of-first-refusal mechanism setting the conditions 
under which South Georgia's firm transportation customers 
could continue to receive service after their contracts expire. 
South Georgia also sought to retain its pre-Order No. 636 
capacity allocation and service priority plan for interruptible 
transportation customers. GIG principally contends that the 
Commission acted in an unduly discriminatory manner in 
approving revised tariffs that treat similarly situated custom-
ers differently by permanently exempting former firm sales 
customers from pre-granted abandonment requirements and 
subjecting non-exempted customers to the onerous right-of-
first-refusal mechanism. GIG further contends that South 
Georgia's method for allocating interruptible capacity, its so-
called "no-bump" rule, has become unjust and unreasonable 
in post-Order No. 636 circumstances. To the extent GIG 
challenges the fairness of the right-of-first-refusal mechanism 
in light of the exemption from pre-granted abandonment 
requirements for some long-term firm transportation ship-
pers, the petition is a collateral attack on Order No. 636, and 
we dismiss that part of the petition. Insofar as GIG requests 
a waiver of pre-granted abandonment regulations, it fails to 
explain why the South Georgia pipeline is so unusual that the 
Commission should be required to grant a waiver. Finally, 
because the Commission chose between two reasonable op-
tions for allocating interruptible capacity--a monthly no- 
bump rule and a permanent no-bump rule--and GIG fails to 
present persuasive reasons to conclude that the Commission's 
choice was arbitrary and capricious, we deny the remaining 
portions of the petition.

__________
F.E.R.C. Stats. & Regs. p 30,950 (1992); order on reh'g, Order No. 
636-B, 61 F.E.R.C. p 61,272 (1992); aff'd in part, rev'd in part, 
United Distrib. Cos. v. FERC, 88 F.3d 1105 (D.C. Cir. 1996), cert. 
denied, 117 S. Ct. 1723 (1997); on remand, Order No. 636-C, 78 
F.E.R.C. p 61,186 (1997).


 I.

 Beginning in 1978, following enactment of the Natural Gas 
Policy Act,5 the Commission began to restructure its regula-
tions to enable the market to play a greater role in determin-
ing the supply, demand, and price of natural gas. See Conoco 
Inc. v. FERC, 90 F.3d 536, 539-40 (D.C. Cir. 1996), cert. 
denied, 117 S. Ct. 1017 (1997); United Distrib. Cos. v. FERC, 
88 F.3d 1105, 1122-23 (D.C. Cir. 1996). As part of this 
restructuring, on April 16, 1992, the Commission issued Order 
No. 636, which was designed "to ensure that all shippers have 
meaningful access to the pipeline transportation grid so that 
willing buyers and sellers can meet in a competitive, national 
market to transact the most efficient deals possible." Order 
No. 636, F.E.R.C. Stats. & Regs. p 30,939 at 30,393. To 
achieve this goal, the Commission required interstate pipe-
lines to restructure their services to separate the transporta-
tion of gas from the sale of gas, to change the design of their 
transportation rates, and to take other actions to promote a 
free market in gas transportation. See Order No. 636-C, 78 
F.E.R.C. p 61,186 at 61,766.

 On December 1, 1992, South Georgia submitted a compli-
ance filing of revised tariffs, providing, as relevant here, for a 
"pre-granted abandonment" requirement under which firm 
transportation service 6 of one year or more ends automatical-
ly at the end of a service agreement. See First Order, 63 
F.E.R.C. p 61,190 at 62,431. The filing expressly exempted 
customers who converted from sales to firm transportation 
service after February 13, 1991, and before May 18, 1992, 
from this requirement.7 See id. The filing also provided for 

__________
 5 Pub. L. No. 95-621, 92 Stat. 3350 (1978) (codified as amended 
at 15 U.S.C. ss 3301-3432 (1994)).

 6 "Firm" transportation service is guaranteed, while "interrup-
tible" transportation service is not.

 7 "Pre-grant of abandonment" is authorized by the Commission 
under 18 C.F.R. s 284.221(d)(1) (1997). Under 18 C.F.R. 


a right-of-first-refusal mechanism to allow firm transportation 
customers whose service would stop due to the pre-granted 
abandonment requirement an opportunity to continue to re-
ceive service.8 See id. The filing further provided for alloca-
tion of interruptible transportation service whereby South 
Georgia would deliver service on a first-come, first-served 
basis according to a queue: if a customer significantly 
changed its initial order for gas, it would lose its place in the 
queue, and a customer could not increase the volume of gas in 
its order if to do so would decrease the amount of gas already 
on order by another customer (the "no-bump" rule), while a 
customer would be required to pay scheduling penalties 9 for 

__________
s 284.221(d)(3), however, pre-grant of abandonment is not permit-
ted for customers who converted from sales to firm transportation 
service after February 13, 1991, and before May 18, 1992.

 8 Under 18 C.F.R. s 284.221(d)(2), tariffs must include a right-
of-first-refusal mechanism whereby a customer with a firm trans-
portation contract for a year or longer may avoid pre-granted 
abandonment of service at the expiration of the contract or other 
Commission-authorized arrangement by (1) giving the pipeline time-
ly notice that it will match the longest term and the highest rate for 
firm service (limited to the maximum rate permitted by the Com-
mission) offered by any other person, and (2) executing such a 
matching contract.

 9 The scheduling penalties in this filing greatly exceeded the 
penalties in effect prior to the filing. Over four Commission 
proceedings, GIG and others protested the fairness of these penal-
ties, and the Commission ordered South Georgia to alter them in 
various ways. See First Order, 63 F.E.R.C. p 61,190 at 62,426-28; 
Second Order, 64 F.E.R.C. p 61,251 at 62,764-66; Third Order, 65 
F.E.R.C. p 61,265 at 62,239-42; Fourth Order, 66 F.E.R.C. p 61,112 
at 61,184-86. Ultimately, South Georgia provided for two schedul-
ing penalties. First, a customer must pay a penalty of $0.1681 per 
million British thermal units ("MMBtu") for takes in excess of the 
greater of 50 MMBtu or 10% of daily orders at each delivery point. 
See First Order, 63 F.E.R.C. p 61,190 at 62,426-28; Second Order, 
64 F.E.R.C. p 61,251 at 62,765. This penalty is the same as prior 
penalties. See First Order, 63 F.E.R.C. p 61,190 at 62,426-28. 
Second, a customer must pay a penalty of $0.1681 per MMBtu for 
volumes shipped that are less than 95% of the daily orders at each 


shipping more or less gas than it ordered. See id. at 62,424-
26.

 GIG objected to South Georgia's filings on two grounds. 
First, GIG claimed that the pre-granted abandonment re-
quirement, subject to the right-of-first-refusal mechanism, 
unduly discriminates against customers who are not exempt-
ed from it. See First Order, 63 F.E.R.C. p 61,190 at 62,431. 
Second, GIG complained that the "no-bump" rule could pre-
vent a customer with a preferable queue position from in-
creasing its volume of gas shipped and could prevent a 
customer who had previously reduced its daily orders for the 
purpose of avoiding scheduling penalties from restoring its 
daily orders to previous levels. See id. at 62,425. We 
describe the Commission's proceedings relating to these two 
issues in turn.

 The Commission's consideration of GIG's challenge to the 
pre-granted abandonment requirement spanned two proceed-
ings. In the First Order, the Commission dismissed GIG's 
concern about undue discrimination, observing that customers 
not exempted from pre-granted abandonment could protect 
themselves from loss of service at the end of a service 
agreement by negotiating an "evergreen" or "roll-over" 
clause 10 into their service agreements. See First Order, 63 

__________
delivery point. See Second Order, 64 F.E.R.C. p 61,251 at 62,764-
66. This penalty is new. See First Order, 63 F.E.R.C. p 61,190 at 
62,427-28. For both scheduling penalties, where the scheduling 
variance "causes extreme harm to the system," the customer must 
pay a penalty of $10 per MMBtu for the relevant variance--more 
than 59 times the regular penalty rate. Second Order, 64 F.E.R.C. 
p 61,251 at 62,765. This super-penalty also is new. See First 
Order, 63 F.E.R.C. p 61,190 at 62,426-28. Without providing evi-
dence in the record, GIG contends and the Commission does not 
dispute that the super-penalty is the norm because the pipeline is 
usually at capacity, resulting in significant increases in penalties 
over those in effect prior to these proceedings. GIG does not 
appeal the reasonableness of the penalties themselves, however, 
only noting their allegedly unreasonable effect in conjunction with 
South Georgia's no-bump rule.

 10 The Commission permits a pipeline and customer to negoti-
ate an "evergreen" or "roll-over" clause into their service agree-


F.E.R.C. p 61,190 at 62,432. In the Second Order, in re-
sponse to GIG's assertion that the pre-granted abandonment 
requirement was unduly discriminatory because only a small 
minority of South Georgia's firm transportation customers 
were subject to it,11 the Commission observed that in addition 
to being protected by the right to negotiate evergreen or roll-
over clauses, non-exempted customers were also protected 
from automatic cessation of service by the right-of-first-
refusal mechanism, "which permit[s] a continuation of service 
as long as the [customer] is willing to pay the maximum rate 
[permitted by the Commission] and match the contractual 
term of a competing offer." Second Order, 64 F.E.R.C. 
p 61,251 at 62,769.

 The Commission's consideration of GIG's protest to the no-
bump rule spanned four proceedings, during which the Com-
mission vacillated in its approach. Initially, the Commission 
ruled that GIG's complaints had already been addressed 
within South Georgia's filings. See First Order, 63 F.E.R.C. 
p 61,190 at 62,426. But this conclusion was based on the 
Commission's misinterpretation of a longstanding South 
Georgia tariff provision that historically had permitted cus-
tomers to prearrange a reduction in their orders without loss 
of queue position for such rare occurrences as facilities main-
tenance; the Commission misinterpreted this provision to 
mean that on any day, a customer could decrease its orders to 
avoid scheduling penalties but would still maintain its queue 
position. See id. As GIG's complaint was that customers 
would not be able to do just that, the Commission ruled that 

__________
ment to allow them to extend the agreement prior to its termination 
and thus avoid automatic termination pursuant to pre-granted 
abandonment regulations. See Order No. 636-A, F.E.R.C. Stats. & 
Regs. p 30,950 at 30,627-28; see also United Distrib. Cos., 88 F.3d 
at 1139.

 11 Most of South Georgia's current firm transportation service 
customers converted to firm transportation service from sales ser-
vice after February 13, 1991, and before May 18, 1992, and thus 
only a small minority are not exempted from automatic termination 
under the pre-granted abandonment mechanism. See Second Or-
der, 64 F.E.R.C. p 61,251 at 62,769.


GIG's complaint was resolved. See id. Following South 
Georgia's protests that this longstanding tariff provision was 
meant to apply only in narrow circumstances, and not to 
customers wishing to decrease their orders to avoid schedul-
ing penalties, the Commission reversed itself in the Second 
Order and adopted South Georgia's interpretation of the 
provision, reasoning that its previous interpretation of South 
Georgia's tariff would lead to "gamesmanship" that would 
harm South Georgia and its customers with less preferable 
queue positions. See Second Order, 64 F.E.R.C. p 61,251 at 
62,762.

 Also in its Second Order, however, the Commission inter-
preted a different South Georgia tariff provision as meaning 
South Georgia intended the no-bump rule to operate on a 
monthly basis, whereby at the beginning of the month cus-
tomers with preferable queue positions could increase the 
volume of their orders of gas, even if doing so would "bump" 
(decrease) the volume of gas available to customers with less 
preferable queue positions. See id. at 62,763. The Commis-
sion approved this monthly basis because it would "narrow 
the application of the no-bump rule and [would] avoid unfair-
ness to high-queue-position [interruptible transportation cus-
tomers] while maintaining system stability." Id. This Com-
mission interpretation was consistent with GIG's request and 
addressed its concerns because it meant that customers with 
preferred (i.e., high) queue positions could bump those with 
less preferred queue positions at the beginning of each 
month. See Third Order, 65 F.E.R.C. p 61,265 at 62,237. 
South Georgia protested, explaining that the purpose of the 
no-bump rule was to protect customers who consistently 
shipped a steady volume of gas, at the expense of those who 
varied the volumes they shipped through the pipeline. See 
id. According to South Georgia, removing this protection 
would discourage long-term contracts for steady volumes and 
could reduce the amount of gas South Georgia is able to ship 
through its system overall, thus hurting its business.12 See 

__________
 12 Essentially, South Georgia argued that its business is best 
served by discriminating in favor of long-term, steady volume 


id. Once again the Commission reversed itself, this time 
explaining that South Georgia had not intended its no-bump 
rule to operate on a monthly basis, adopting South Georgia's 
rationale as its own, and declaring South Georgia's no-bump 
rule, as outlined in its original filing, to be reasonable. See 
id. at 62,238. The Commission acknowledged that GIG's 
preferred monthly no-bump rule was also reasonable, but 
concluded that there was no good reason to reject South 
Georgia's proposal in favor of GIG's. See id.

 GIG sought rehearing of the Third Order, again requesting 
that the Commission direct South Georgia to establish a 
monthly no-bump rule. See Fourth Order, 66 F.E.R.C. 
p 61,112 at 61,184. For the first time, GIG argued that 
because capacity on the South Georgia pipeline was con-
strained, the approved no-bump rule created a Hobson's 
choice for interruptible transportation customers, forcing 
them either to pay high penalties or to lose preferred queue 
positions. See id. GIG maintained that this situation was 
fundamentally unfair and that a monthly no-bump rule was 
more reasonable than that approved by the Commission. 
The Commission disagreed, maintaining that the "use-or-lose" 
feature of the approved no-bump rule was not unreasonable 
and that if GIG and similarly situated customers were con-
cerned about reserving capacity, they could avoid scheduling 
penalties by requesting firm transportation capacity and pay-
ing a reservation charge or by seeking to obtain released firm 
transportation capacity on a short-term basis from a firm 
transportation service customer. See id.

 GIG timely petitioned for review of all four Commission 
orders. GIG contends that South Georgia's pre-granted 
abandonment requirement unduly discriminates, within the 

__________
customers at the expense of variable volume customers; the former 
either ship a steady volume of gas or pay a scheduling penalty, and 
in return are guaranteed their queue position and their desired 
volume of gas, while the latter avoid scheduling penalties by sched-
uling only the volume of gas that they need but face loss of 
preferred queue positions and may not always increase the volume 
of gas they ship as they might like.


meaning of 15 U.S.C. ss 717c(b), 717d(a) (1994), against all 
customers not subject to its exemption. GIG points to the 
facts that only a small minority of customers are not exempt-
ed from the pre-granted abandonment requirement and that 
these customers must "go through cumbersome, risky, poten-
tially expensive [right-of-first-refusal] procedures." See su-
pra note 11. Treating two sets of similarly situated custom-
ers differently in this way is per se unduly discriminatory, 
GIG maintains, and the discriminatory impact is exacerbated 
because capacity on South Georgia's system is constrained. 
GIG also contends that the Commission did not offer a 
justification for such disparate treatment. With regard to the 
no-bump rule, GIG contends that the Commission failed to 
provide an adequate explanation for its numerous reversals of 
its position and failed to address significant arguments, in-
cluding that: (1) the new scheduling penalties, see supra note 
9, combined with the no-bump rule provide an incentive for 
South Georgia to unjustly enrich itself by frustrating variable 
customers' efforts to receive service, and (2) whereas, prior to 
1992, the South Georgia system was rarely at capacity, and 
thus variable customers were generally able to increase or 
decrease volumes shipped, at present variable customers can-
not do so because capacity is not always available.

 II.

 Initially, the Commission contends, and we agree, that 
GIG's challenge to South Georgia's pre-granted abandonment 
requirement is an impermissible collateral attack on Order 
No. 636, on which the 60-day time limit for challenges 
provided in 15 U.S.C. s 717r(b) (1994) has long since expired. 
See Transwestern Pipeline Co. v. FERC, 988 F.2d 169, 174 
(D.C. Cir. 1993); cf. ANR Pipeline Co. v. FERC, 71 F.3d 897, 
900-01 (D.C. Cir. 1995); American Gas Ass'n v. FERC, 912 
F.2d 1496, 1514-15 (D.C. Cir. 1990). Order No. 636 exempts 
from pre-granted abandonment requirements those custom-
ers who converted from sales to firm transportation service 
after February 13, 1991, and before May 18, 1992. See Order 
No. 636, F.E.R.C. Stats. & Regs. p 30,939 at 30,636; 18 
C.F.R. s 284.221(d)(3). The Commission explained that it 


approved South Georgia's revised tariffs because they imple-
mented the pre-granted abandonment requirement and the 
right-of-first-refusal mechanism required by Order No. 636, 
see Second Order, 64 F.E.R.C. p 61,251 at 62,769, an assess-
ment GIG does not dispute. GIG's complaint, that the pre-
granted abandonment requirement subjects a minority of 
customers to riskier and costlier procedures for preserving 
their service while treating similarly situated customers dif-
ferently, was considered during the Order No. 636 proceed-
ings. In response to a challenge that under Order No. 636 
firms not exempted from pre-granted abandonment would 
encounter greater difficulty and cost in maintaining service at 
the end of a contract, the Commission concluded that the 
exemption is not discriminatory because parties have the 
right to defer pre-granted abandonment by either negotiating 
a roll-over clause into their contracts or utilizing their guaran-
teed right-of-first-refusal. See Order No. 636, F.E.R.C. 
Stats. & Regs. p 30,939 at 30,452. Further, during the Order 
No. 636-A proceedings, the Commission concluded that there 
was no reason to expand the exemption from pre-granted 
abandonment to cover all converted firm sales customers. 
See Order No. 636-A, p 30,950 at 30,635-36. The court, in 
turn, concluded that while "roll-over" clauses would not alone 
suffice to protect customers' ability to renew their service 
contracts, the "mandatory right-of-first-refusal mechanism 
... provides substantially more protection to existing custom-
ers" and the complaint procedure 13 provides back-up protec-
tion. United Distrib. Cos., 88 F.3d at 1139-40 & n.42. Thus, 
the court affirmed pre-granted abandonment requirements 
including the exemption, subject to one remanded issue not 
relevant here, because the combination of roll-over clauses, 
the right-of-first-refusal mechanism, and the complaint proce-
dure adequately guaranteed that customers would be able to 
extend service at the end of their contracts. See id. at 1138-
41. Consequently, to the extent that GIG contends that 
South Georgia's pre-granted abandonment requirement is 

__________
 13 The Commission provides a complaint mechanism to remedy 
an unjustified loss of service. See 18 C.F.R. s 385.206 (1997); 
United Distrib. Cos., 88 F.3d at 1139 n.42.


inherently discriminatory for treating like customers differ-
ently, or that the risks and costs placed on non-exempt 
customers are unduly burdensome, its challenge is a collateral 
attack on Order No. 636, and the court lacks jurisdiction to 
consider it now.

 As to GIG's request for a waiver due to special factors, the 
only question is whether the Commission's refusal to grant a 
waiver was based on reasoned and principled decisionmaking 
supported by the record. See Pennsylvania Office of Con-
sumer Advocate v. FERC, 131 F.3d 182, 185-86 (D.C. Cir. 
1997) (citing Western Resources, Inc. v. FERC, 9 F.3d 1568, 
1572 (D.C. Cir. 1993)). GIG contends that the Commission 
should have waived its pre-granted abandonment requirement 
because, in the unique context of South Georgia's system, this 
requirement creates undue discrimination not present in oth-
er pipelines. The only unique factors GIG identifies, howev-
er, are the small percentage of customers subject to the pre-
granted abandonment requirement and the capacity con-
straint of South Georgia's system. GIG contends that be-
cause South Georgia is the only pipeline on which all of the 
pipeline's local distribution customers converted from sales 
service to firm transportation service during the exemption 
period designated in Order No. 636, see supra note 11, the 
amount of capacity now held by non-exempt customers is 
small, and because the system is at capacity, the pipeline has 
greater monopoly power in contract renewal negotiations to 
hold out for maximum terms and high rates. GIG's conten-
tion is unpersuasive, however, for several reasons. First, 
because the maximum contract term is five years, see Order 
No. 636-C, 78 F.E.R.C. p 61,186 at 61,774, and the maximum 
rates allowable are those set by the Commission, which must 
be just and reasonable, see 18 U.S.C. s 717c(a), the worst that 
non-exempt members can expect in contract negotiations is to 
face a five year term at a just and reasonable rate. GIG 
makes no plausible argument that this situation is particularly 
bleak. Second, although GIG asserts that South Georgia is 
the only pipeline whose customers all converted from sales to 
firm transportation service between February 13, 1991, and 
May 18, 1992, GIG offers no evidence that other pipelines are 


not similarly capacity-constrained, or that customers of other 
pipelines subject to a right-of-first-refusal mechanism negoti-
ate shorter terms and lower rates significantly more often 
than South Georgia's customers. In short, while its argu-
ment has facial appeal, GIG fails to support it with any hard 
data on actual impact or an adequate explanation of why the 
South Georgia pipeline is unusual compared to other pipelines 
such that the Commission should be required to grant a 
waiver. Therefore, the Commission's approval of South 
Georgia's compliance filings was not unreasonable.

 III.

 GIG's contentions regarding the no-bump rule fare no 
better. At issue is whether it was unreasonable, or arbitrary 
and capricious, for the Commission to allow South Georgia to 
continue its historic practice of rewarding steady volume 
interruptible customers at the expense of variable volume 
customers. See Pennsylvania Office of Consumer Advocate, 
131 F.3d at 185-86. Where the Commission chooses among 
reasonable alternatives, the court defers to the Commission's 
selection so long as its decision is reasonable and consistent 
with the intent of the statutes it is implementing. See United 
Distrib. Cos., 88 F.3d at 1166. Where the Commission vacil-
lates in its reasoning, the court's role is to ensure that it has 
justified its ultimate decision and responded to substantial 
arguments raised by petitioners. See Williams Natural Gas 
Co. v. FERC, 3 F.3d 1544, 1550-51 (D.C. Cir. 1993); K N 
Energy, Inc. v. FERC, 968 F.2d 1295, 1303-04 (D.C. Cir. 
1992).

 While GIG correctly notes that the Commission vacillated 
regarding the no-bump rule, we disagree with its contention 
that the Commission failed to justify its ultimate decision. 
First, the Commission accepted as its own South Georgia's 
reasoning that the pipeline would lose interruptible transpor-
tation service if it could not guarantee capacity to customers 
willing to maintain steady volumes. See Third Order, 65 
F.E.R.C. p 61,265 at 62,237-38. Second, the Commission 
explained that there is nothing improper in making an initial 
allocation of interruptible capacity on a first-come, first-


served basis but requiring a customer to maintain its volume 
in order to preserve its place in the queue. See id. at 62,238. 
This mechanism is reasonable, the Commission explained, 
because it gives an advantage to customers with preferred 
queue positions in the initial allocation of capacity and in 
allocation of additional capacity that comes available, while 
preventing customers with less preferable queue positions 
from losing their capacity to those with better queue positions 
and thus enabling lower queue customers to maintain steady 
volumes of gas and encouraging them to continue contracting 
with South Georgia. See id. Moreover, the Commission 
reasoned, a customer seeking additional capacity has the 
option of requesting firm transportation capacity and paying 
the associated reservation charge, or obtaining released firm 
transportation capacity on a short-term basis from a firm 
shipper. See Fourth Order, 66 F.E.R.C. p 61,112 at 61,184. 
For these reasons, the Commission determined that "[r]equir-
ing [interruptible transportation customers] to use, or lose, 
their capacity is not unreasonable." Id. Although the Com-
mission also found that the monthly no-bump rule proposed 
by GIG was reasonable, it concluded that the choice between 
South Georgia's proposal and GIG's amounted to a policy 
decision as to which customers ought to receive a preference 
when the system is at capacity, and there was no reason to 
reject South Georgia's choice in the matter. See Third Order, 
65 F.E.R.C. p 61,265 at 62,238. So viewed, the Commission 
adequately explained its ultimate conclusion.

 As to GIG's complaint that the Commission failed to ad-
dress substantive concerns presented to it, we find it no more 
persuasive. Contrary to GIG's position that the Commission 
did not address its concerns regarding the newly developed 
capacity constraints on the system, the Commission makes 
clear that its analysis is premised on the assumption that the 
system is at capacity, for when it is not, the no-bump rules do 
not constrain variable customers. See Third Order, 65 
F.E.R.C. p 61,265 at 62,238. It reasons that when the system 
is at capacity, some customers will be unable to ship maximal-
ly desired volumes; in determining which customers will be 
constrained, South Georgia's mechanism is as reasonable as 


GIG's. See id. South Georgia's proposal requires high-
queue shippers either to use or to lose their service, and 
makes clear that although high-queue shippers are preferred 
in initial allocation and when additional capacity becomes 
available, such shippers are not guaranteed "the right to 
capacity at the expense of lower queue positioned shippers 
that desire to continue their flows of gas under the IT 
service." Id. The balance the Commission chose is clearly 
not an unreasonable one.

 Also, contrary to GIG's contention that the Commission 
failed to consider the fact that the new scheduling penalties 
provided an opportunity for South Georgia to reap substantial 
profits while purposefully frustrating the ability of variable 
volume customers to receive service, see supra note 9, the 
Commission made clear that it did consider the impact of the 
new scheduling penalties when it explained how variable 
customers could avoid paying the penalties. See Fourth 
Order, 66 F.E.R.C. p 61,112 at 61,184. In addition, the 
Commission noted that GIG could file a complaint under 
section 5 of the Natural Gas Act, 15 U.S.C. s 717d, when it 
believes the pipeline is abusing its discretion or acting unrea-
sonably. See Fourth Order, 66 F.E.R.C. p 61,112 at 61,186.14

 Accordingly, we dismiss the petition insofar as it collateral-
ly attacks Order No. 636 with respect to the Commission's 
approval of South Georgia's pre-granted abandonment re-
quirements, subject to the right-of-first-refusal mechanism, 
and deny the petition with respect to the Commission's 
refusal to waive its pre-granted abandonment requirement or 
modify South Georgia's historic no-bump tariff provision.

__________
 14 While GIG contends that the Commission failed to address 
the fact that the first-come, first-served rule had been in South 
Georgia's tariffs since 1987, it fails to explain why this fact should 
alter the Commission's conclusions. Furthermore, while GIG con-
tends that the Commission also failed to address unclear tariff 
language, the Commission's ultimate interpretation of the tariffs is 
sufficient. See Fourth Order, 66 F.E.R.C. p 61,112 at 61,185-86.