**AMOCO PRODUCTION COMPANY and Amoco Energy Trading Corporation, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**City of Winfield, Kansas, et al., Intervenors.**

No. 97–1607.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1998.

Decided Oct. 23, 1998.

Katherine B. Edwards argued the cause for petitioners. With her on the briefs were Nancy J. Skancke, Frederick T. Kolb and Mickey J. Lawrence.

Susan J. Court, Special Counsel, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Jay L. Witkin, Solicitor, John H. Conway, Deputy Solicitor, and Edward S. Geldermann, Attorney.

Richard D. Avil, Jr. argued the cause for intervenor NorAm Gas Transmission Company. With him on the brief were Martin V. Kirkwood, Jason F. Leif and Sherrie N. Rutherford.

Before: SILBERMAN, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in part and dissenting in part filed by Circuit Judge RANDOLPH.

SILBERMAN, Circuit Judge:

Petitioners, a group of natural gas shippers who are customers of Intervenor NorAm Gas Transmission Company's pipeline, seek review of an order issued by FERC approving proposed tariffs filed by NorAm. Those tariffs increase certain penalties on shippers and allow NorAm to retain the revenues resulting from the pipeline's assessment of these and other penalties. We deny the petition with regard to increased penalty rates, but remand to the Commission for a more adequate explanation of its refusal to require penalty revenue to flow-through to the pipeline's customers.

I.

As we recently explained, in *Pennsylvania Office of Consumer Advocate (Pennsylvania) v. FERC*, 131 F.3d 182, 184–85 (D.C.Cir. 1997), *modified on other grounds*, 134 F.3d 422 (D.C.Cir.1998), the revolutionary Order 636, requiring pipelines to unbundle their transportation and sales services, created certain operational problems for pipelines. Under the new regime, shippers may contract with pipelines for transportation services; a shipper typically contracts with a pipeline to reserve capacity for a maximum daily volume of gas that the shipper may tender to and remove from the system, and in turn, the pipeline agrees to ensure that it has the capacity to transport the agreed upon quantities. In order to reduce the cost of reserving transportation capacity, however, shippers may set their maximum volume levels lower than anticipated, hoping that at peak times they can get transportation service on an interruptible basis. In those situations, however, interruptible service may not be available, and shippers then might

choose to take more gas from the system than the maximum volume allowed under their contracts. Because the operational integrity of the pipeline can be threatened by imbalances between the volume of gas tendered to the pipeline and the volume taken by shippers, pipelines seek to deter shippers from abusing the system by issuing Operational Flow Orders (OFOs)—which direct shippers to take specific actions to help keep the system in balance—and by imposing penalties. When a shipper takes more gas from the system than the maximum volume allowed under the shipper's contract, the pipeline imposes an unauthorized overrun penalty. Penalties are also imposed for violations of OFOs.

In the winter previous to NorAm's filing when the spot market price for gas increased substantially, NorAm's shippers on 250 occasions took overruns and thus incurred penalties. The cost of taking gas out of the pipeline, even with the penalties added, was apparently less than the shippers would have incurred from alternative sources. Although NorAm, in the previous year, did not impose any penalties for shippers' failure to comply with OFOs, NorAm proposed in a section 4 rate filing under the Natural Gas Act to increase penalties for both unauthorized overruns and failures to comply with OFOs. The Commission, over the objection of petitioners, approved the filings as "just and reasonable."

## II.

Although petitioners objected below to the increase in both penalties, before us they challenge only the OFO increase and argue that it is unjustified. The existing penalty level, it is claimed, was obviously adequate, since no penalties were incurred. Their more fundamental challenge, however, is to the destination of any penalty revenue. Petitioners argue that under cost of service pricing a pipeline is not entitled to pocket that

money; it must be passed on to its customers.

■ We have little difficulty in rejecting petitioners' claim that the Commission acted unreasonably in permitting NorAm's increase in OFO penalties. The Commission explained that NorAm's increase in OFO penalties merely brought NorAm into line with OFO penalties on nearby pipelines, such harmonization being reasonable to ensure adequate deterrence of abuses on NorAm's line. Moreover, there is an apparent functional relationship between OFO penalties and the unauthorized overrun penalty, since both penalties aim at deterring shipper abuse.

■ Much more troublesome, however, is petitioners' fundamental claim that the pipeline will enjoy a "windfall" if it is permitted to keep penalty revenue. In *Pennsylvania*, we rejected a similar analytic challenge (in a section 5 proceeding).[1] But in that case, the penalty rate had been in existence for the previous year yet no penalties had been imposed. We thus thought that the Commissioner was warranted in concluding that "the mere possibility of revenue gains" did not "justif[y] a *prospective* requirement that the [penalty] revenues be credited to customers." *Pennsylvania*, 131 F.3d at 187 (emphasis added). The Commission, moreover, assured us that it was monitoring any revenues generated by the penalties and that it could revisit the issue in future rate filings if "significant" revenues were generated.[2] Importantly, we did say that "[t]here appears to be no doubt that if [the pipeline] were to collect substantial penalties, those revenues would not be justified by the pipeline's cost of service." *Id.* at 187.

In this case, NorAm, by contrast, has collected, in the year prior to the section 4 filing, 1.8 million dollars in overrun penalty revenues. (Indeed, the Commission decision in this case was noted in *Pennsylvania* because NorAm's penalties—at least to us—appeared significant. *See id.* at 186.) The Commission, nevertheless, predicted that fu-

---

1. Although this case involves a section 4 proceeding, the analysis regarding revenue retention is the same. The difference is that the remedy in section 5 actions is prospective only.

2. The Commission made the same pledge here; however, as petitioners point out, NorAm is not obligated to make a section 4 filing in the future, and as we explained, relief under section 5 is prospective only.

ture penalty revenue would not be significant because the increase in penalty rates would deter shippers from taking unauthorized gas or violating OFOs. The difficulty with FERC's logic is that it does not follow that NorAm's revenue will decrease merely because the penalties are raised. Even if a lesser number of penalties are imposed, the increased penalty rate might result in a gross increase in penalty revenue. Moreover—and this is the key imponderable—whether a shipper will be willing to incur the penalty depends on his cost in securing alternative supplies in a tight market. Although we were willing to defer to FERC's predictive judgment in *Pennsylvania* because past experiences supported that judgment, its prediction here is so speculative that we cannot treat it, without more, as a sufficient explanation. In any event, the Commission never even explains how much revenue should be regarded as significant.

The Commission forthrightly asserts that as a matter of policy it does not want to require pipelines to flow through penalty rates to their customers. But FERC neither adequately explains nor seeks to justify that policy in terms of the statute. The Commission does not suggest that to pass the penalties through to all customers would undermine any deterrent effect. (It could easily provide that the customers paying the penalty would be denied participation if that were thought to be a problem.) Nor does the Commission claim (as does the intervenor) that to do so would be administratively burdensome. The Commission is content to assert, somewhat mechanically, that it does not expect the revenues to be "significant," so presumably we should think the problem is *de minimis.*

Under these circumstances, we are obliged to remand to the Commission for a more adequate explanation for its order.

RANDOLPH, Circuit Judge, concurring in part and dissenting in part:

In *Pennsylvania Office of Consumer Advocate v. FERC,* we faced the same question we face here regarding a pipeline's proposal to assess penalties on those customers whose actions threatened the pipeline's operational integrity—namely, whether "as a policy matter, the mere possibility of revenue gains [from a natural gas pipeline's collection of penalties] justifies a prospective requirement that the revenues be credited to customers." 131 F.3d 182, 187 (D.C.Cir.1997). We there sustained the Commission's refusal to impose such a requirement, in part because "the record failed to demonstrate that such revenue gains would occur." The same is true here, as are the other reasons we gave for upholding the Commission. Yes, NorAm collected $1.8 million in overrun penalties (but nothing in penalties for violations of Operational Flow Orders) the year before its filing. If NorAm had proposed continuing the same level of penalties for the future, I would be with my colleagues. But NorAm proposed, and the Commission approved, an increase in penalties in order to prevent shippers from taking more gas from the system than they were entitled to take. Given the increase in penalties, there is no evidence in the record that "revenue gains would occur" in the future; past experience shows nothing of the sort. In the Commission's expert judgment, based partly on the experience of other pipelines having the same level of penalties, little or no penalty revenue will be generated under the new penalty regime. As in *Pennsylvania Office of Consumer Advocate,* the Commission's prediction may turn out to be right, or it may turn out to be wrong, but this "is an accepted feature of the rate-setting regime." *Id.* at 187. The sort of certainty about the future my colleagues want from the Commission is unattainable, depending as it does on many unknowables, not the least of which is how cold the winters will be.

Although I therefore dissent from the majority's opinion insofar as it orders the Commission to explain more fully its decision not to require penalty revenue crediting, I concur in the portion of the opinion upholding the increase in penalties.