**KOCH GATEWAY PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Utilities Board, of the City of Atmore, Alabama, et al., Intervenors.**

No. 97–1024.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1998.

Decided Feb. 27, 1998.

Michael E. McMahon argued the cause and filed the briefs for petitioner.

Joel M. Cockrell, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, Washington, DC, was on the brief.

Before: EDWARDS, Chief Judge, WALD, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In an attempt to comply with the restructuring of the natural gas pipeline industry ordered by the Federal Energy Regulatory Commission ("FERC" or "the Commission"), Koch Gateway Pipeline Company ("Koch" or "KGPC") revised its tariff to implement a new procedure for resolving imbalances in the amount of gas shipped by its transportation customers. After reviewing Koch's subsequent report detailing how this procedure had worked in practice, the Commission held

that Koch's accounting system was violative of its tariff and ordered Koch to refund over $3 million in net revenues to its customers. We now grant Koch's petition for review of this decision and hold that while the Commission did not err in finding Koch's accounting practices to be inconsistent with its tariff, it abused its remedial discretion by ordering a refund given that Koch did not ultimately garner a windfall in the process. We therefore remand this case to the Commission for reconsideration of its refund order in light of the Commission's existing policies and goals.

## I. BACKGROUND

On April 16, 1992, the Commission issued Order No. 636,[1] its attempt to open the natural gas market to competition by allowing all natural gas suppliers to compete for sales on an equal footing.[2] Its primary method for achieving greater competition was to require that pipelines unbundle (*i.e.*, separate) their sales services from their transportation services instead of providing both as part of the same package. Pipelines were thus required to provide transportation service at equivalent levels of quality without regard to whether the gas had been purchased from the pipeline or from another supplier. *See, e.g., Western Resources, Inc. v. FERC,* 9 F.3d 1568, 1573 (D.C.Cir.1993).

As we have recently noted, *see Pennsylvania Office of Consumer Advocate v. FERC* ["*POCA*"], 131 F.3d 182, 184 (D.C.Cir.1997), *corrected by* 134 F.3d 422 (D.C.Cir.1998), the mandatory unbundling created a new set of

difficulties. Because customers were permitted to purchase transportation as a separate service, and thus would be bringing gas purchased elsewhere to the pipeline, pipelines might find it difficult to regulate imbalances in the amount of gas that was being delivered to, or taken from, the pipeline. Put simply, customers delivering more gas for transportation than they took out might threaten system integrity by overloading the pipeline; customers taking more gas than they delivered to the pipeline would hinder the pipeline's ability to render dependable service to its remaining customers. *See id.*; Order No. 636, ¶ 30,939, at 30,424 ("All shippers must recognize that the action or nonaction by a single shipper may affect a pipeline's ability to serve all other shippers."). Anticipating that such problems would likely occur,[3] Order No. 636 stated that, as part of each pipeline's restructuring process, "[t]he pipeline and its shippers need to fashion reasonable, yet effective, methods such as penalties to deter shipper behavior inimical to the welfare of the system and other shippers." Order No. 636, ¶ 30,939, at 30,424. The Commission thus intended that each pipeline and its customers would "work out individual pipeline solutions, to be considered in subsequent pipeline restructuring proceedings." *POCA,* 131 F.3d at 184; *see also* Order No. 636–A, ¶ 30,950, at 30,546–47.

On November 2, 1992, Koch submitted its revised tariff, which included the changes necessary to comply with Order No. 636.[4] Section 20 of the revised tariff established

1. Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939 (1992); *order on reh'g,* Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950 (1992); *order on reh'g,* Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992); *aff'd in part, rev'd in part, United Distrib. Cos. v. FERC,* 88 F.3d 1105 (D.C.Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997); *on remand,* Order No. 636–C, 78 F.E.R.C. ¶ 61,186 (1997).

2. As this court has previously noted, "[t]he enormous economies of scale involved in the construction of natural gas pipelines tend to make the transportation of gas a natural monopoly." *United Distribution Cos.,* 88 F.3d at 1122.

3. Pipelines had already experienced such problems in complying with Order No. 436, which allowed pipelines to file "open-access" tariffs that offered nondiscriminatory transportation service. *See* Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 42,408 (1985); *see also POCA,* 131 F.3d at 184.

4. At the time of its initial submission, Koch was known as United Gas Pipe Line Company. On November 10, 1992, however, Koch Industries, Inc., acquired all of United's stock, and on August 24, 1993, the name of the pipeline was changed to Koch Gateway Pipeline Company. For the sake of convenience, we shall refer to the pipeline throughout the proceedings before the Commission as "Koch."

Koch's "cash-in/cash-out" procedure for resolving transportation imbalances. Under this system,[5] Koch nets all imbalances among each transportation customer's contracts and sends each customer a statement with its imbalance for the month (month one) on or before the eighth day of the next month (month two). The customer then has until the end of the following month (month three) to trade its imbalances with another shipper or with a storage customer. If it fails to do so, it receives either a charge (*i.e.*, it must "cash-out") or a credit ("cash-in") on its invoice for the next month (month four) at month one's "buy" or "sell" price.[6] There is therefore a three-month lag between the time when the imbalance occurs and the time when the imbalance is finally resolved.

The Commission's policy is that a pipeline may not retain revenues from a cash-in/cash-out system but rather must credit these revenues back to its customers. *See, e.g., Williams Natural Gas Co.*, 64 F.E.R.C. ¶ 61,165, at 62,416 (1993).[7] In accordance with this policy, section 20.1(D) of Koch's tariff provided:

> On [a] quarterly basis, KGPC shall credit on a pro rata basis to its Customers the net revenues (moneys received from shippers under the program less moneys paid out by KGPC less cost of gas purchased to balance the system) to its transportation customers based upon transportation throughput during the applicable period. KGPC will begin paying interest on net revenues computed in accordance with section 154.67(c)(2) of the Commission's Regulations beginning on the 1st day of the next quarter and continuing until the

revenues have been credited to the shippers.

*Koch Gateway Pipeline Co.*, 77 F.E.R.C. ¶ 61,161, at 61,617 (1996). The Commission approved Koch's tariff, including this provision, to be effective on November 1, 1993, subject to certain revisions not at issue here. *See United Gas Pipe Line Co.*, 65 F.E.R.C. ¶ 61,006 (1993).

After Koch had been operating under the cash-in/cash-out system for over two years, it filed its first report with the Commission on April 11, 1996, covering the period from November 1, 1993, to December 31, 1995.[8] The report showed that at the end of each quarter in 1995, Koch included a line item labeled "Operational Purchases: Accrual," which eliminated any net revenues, and a line item at the beginning of the subsequent quarter labeled "Operational Purchases: Accrual Reversal," which reinstated the deducted amount. As a result of these adjustments, Koch showed no net revenues at the end of each quarter and thus owed no refund to its customers. A number of gas and oil companies subsequently moved to intervene, requesting that these adjustments be explained, and on June 17, 1996, the Commission granted this request. *See KGPC*, 75 F.E.R.C. ¶ 61,305.

On July 2, 1996, Koch filed supplemental information to explain the report. The "Operational Purchases: Accrual" line, Koch explained, represented "the estimated cost of the gas Koch must purchase to replace gas bought from Koch by its customers through the imbalance resolution process." Joint Appendix 33. Koch argued that although it supplied any needed gas from its own reserves, it would be inefficient to require it actually to purchase replacement gas at the

---

5. Koch's procedure for resolving imbalances underwent several revisions from the time the first revised tariff was filed. *See, e.g., United Gas Pipe Line Co.*, 64 F.E.R.C. ¶ 61,015 (1993); *Koch Gateway Pipeline Co.*, 65 F.E.R.C. ¶ 61,338 (1993); *Koch Gateway Pipeline Co.*, 66 F.E.R.C. ¶ 61,232 (1994). We describe here the system as it existed at the time of the order under review.

6. The "buy" and "sell" prices are set at a distance from the prevailing market price in order to discourage shippers from allowing imbalances in the system to occur.

7. The rationale behind this policy is to deter pipelines from using cash-in/cash-out systems to enhance revenue rather than simply to deter system abuse. *See, e.g., United Gas*, 64 F.E.R.C. ¶ 61,015, at 61,135; *Panhandle Eastern Pipe Line Co.*, 61 F.E.R.C. ¶ 61,357, at 62,429 (1992).

8. Although Koch's tariff required it to make the information in the report available to its customers upon request, it did not require that Koch file such a report with the Commission. *See Koch Gateway Pipeline Co.*, 75 F.E.R.C. ¶ 61,305, at 61,971–72 (1996).

end of each quarter of 1995 (*i.e.,* at the end of month three), since it might be discovered during month four—when the imbalances were resolved—that the purchase would be unnecessary or financially unwise given the current market price.[9] It therefore contended that it was appropriate to set aside at the end of each quarter the amount it would need to spend from the cash-in/cash-out fund until these uncertainties were resolved. The Commission rejected these arguments. *Koch Gateway Pipeline Company,* 76 F.E.R.C. ¶ 61,296 (1996). Because, absent the accounting adjustments, Koch showed net revenues in the cash-in/cash-out fund at the end of each quarter, the Commission held that Koch had violated section 20.1(D) of its tariff by not returning this revenue to its customers. The Commission thus ordered Koch to refund to its customers $3,288,178 in net revenues (the amount of net revenues listed for the last quarter of 1995 before the accrual adjustment). *Id.* at 62,485–86.

Koch subsequently requested a rehearing of this decision, arguing that the tariff's language obligated it to credit revenues to the cash-in/cash-out fund on a quarterly basis but not actually to refund them to its customers. The Commission denied Koch's request, stating that while Koch's interpretation of the tariff was a possible interpretation, it was not the most reasonable one. "The proper course of action," the Commission noted, "was for Koch to go out and actually purchase the gas instead of holding the funds." *KGPC,* 77 F.E.R.C. ¶ 61,161, at 61,618. Koch's petition for review to this court followed, pursuant to 15 U.S.C. § 717r(b) (1994).

## II. ANALYSIS

 In general, we uphold FERC's orders if they are " 'supported by substantial evidence and reached by reasoned decision-making—that is, a process demonstrating the connection between the facts found and the

choice made.' " *Williams Natural Gas v. FERC,* 90 F.3d 531, 533 (D.C.Cir.1996) (quoting *ANR Pipeline Co. v. FERC,* 771 F.2d 507, 516 (D.C.Cir.1985)); *see also* 15 U.S.C. § 717r(b) (finding of Commission as to the facts are conclusive if supported by substantial evidence). Similarly, because Congress has delegated to FERC "a broad range of adjudicative powers over natural gas rates," *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1569 (D.C.Cir.1987), this circuit gives substantial deference to its interpretation of filed tariffs, "even where the issue simply involves the proper construction of language." *Id.; see also Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1549 (D.C.Cir.1993).[10] This deference, as we noted in *Williams,* is simply an acknowledgment that the principles set forth by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), extend to all areas in which an agency has been delegated power by Congress to act. *See Williams,* 3 F.3d at 1549. In a typical *Chevron* analysis, of course, we first consider whether Congress, through the statute under consideration, directly speaks to the "precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. If Congress has not directly addressed the precise question at issue, we then decide whether the agency's construction of the statute is reasonable. *Id.* at 843, 104 S.Ct. at 2781–82. Our review of the Commission's construction of Koch's tariff proceeds in much the same manner. We first look to see if the language of the tariff is unambiguous—that is, if it reflects the clear intent of the parties to the agreement. If the tariff language is ambiguous, we defer to the Commission's construction of the provision at issue so long as that construction is

---

9. Koch began purchasing replacement gas in January 1996. Koch asserted both before the Commission and at oral argument that because of rising market prices, it did not have the necessary funds until this time to replenish the gas in its reserves.

10. We recognize that there are both circuits that agree with our view on this point, *see, e.g., Northwest Pipeline Corp. v. FERC,* 61 F.3d 1479, 1486 (10th Cir.1995), and those that disagree, *see, e.g., Dayton Power & Light Co. v. FERC,* 843 F.2d 947, 953 & n. 12 (6th Cir.1988); *Mid Louisiana Gas Co. v. FERC,* 780 F.2d 1238, 1243 (5th Cir.1986).

reasonable. *See, e.g., Williams,* 3 F.3d at 1551; *Tarpon Transmission Co. v. FERC,* 860 F.2d 439, 442 (D.C.Cir.1988) (interpretation must be "the result of reasoned and principled decisionmaking that can be ascertained from the record").

■ After examining the tariff provision at issue in this case, we cannot say that the language is free from ambiguity. Section 20.1(D) of Koch's tariff requires that it credit net revenues to its transportation customers on a "quarterly basis," a phrase that is open to two interpretations. On the one hand, the phrase could mean that Koch's revenues were to be calculated and credits issued "quarterly"—*i.e.,* every three months—based on whatever information on transportation activity was available to Koch at that time. Alternatively, and equally compelling, the phrase could be interpreted to mean that the analytical "basis" for the calculation of any refunds due would be a three-month period— in other words, that credits had to reflect the total activity that occurred during a given quarter, even if that information did not become fully available until one or two months after the quarter ended. Neither interpretation emerges naturally from the language of the tariff, and Koch has not presented us with any additional information to aid us in divining the meaning intended at the time the tariff was drafted.

We therefore turn to the Commission's interpretation of the tariff provision to determine if it is a reasonable one. The Commission concluded that section 20.1(D), correctly interpreted, requires Koch to calculate its net revenues every three months and issue any necessary credits directly to its customers on the basis of that calculation. *See KGPC,* 77 F.E.R.C. ¶ 61,161, at 61,617. It supported this reading by looking to the surrounding language. First, it noted that the fact that the credit is to be made on a "pro rata basis" suggests that Koch is required to issue individual credits to each transportation customer and not in a lump sum to the cash-in/cash-out fund. Second, it noted that the fact that

Koch is required to pay interest starting on the first day of the next quarter suggests that the refund payment is due at the end of each quarter and not at some point during the following quarter. *Id.* This method of interpretation is certainly a reasonable approach, whether or not it yields the result we would reach were we interpreting the tariff in the first instance.

Koch, nevertheless, disagrees with the Commission's interpretation. First, it argues that the language stating that it "shall credit" net revenues to its customers means only that Koch need credit the cash-in/cash-out fund rather than its customers directly. Second, it contends that the phrase "to balance the system" requires that the fund first be balanced—*i.e.,* through an accounting adjustment—before net revenues are calculated.[11] Although Koch's suggested interpretations are possible readings of the tariff provision, we are not convinced that they are more reasonable interpretations than the one the Commission puts forward. As a result, we defer to the Commission's interpretation.

■ Given this interpretation, it was not wrong for the Commission to conclude that Koch's accounting adjustment violated the terms of its tariff. Koch argues that the Commission's conclusion and order of a refund were inconsistent with its decision in *Williams Natural Gas Co.,* 75 F.E.R.C. ¶ 61,040 (1996), and thus were arbitrary and capricious. As an administrative agency, FERC is subject to the constraints of the Administrative Procedure Act and consequently is forbidden from acting in a way that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). Thus, if the two cases were indeed treated differently without a sufficient justification, Koch's contention would deserve consideration, since we have noted that where an agency treats similar situations differently without a reasoned explanation, its decision

---

11. As the Commission notes, Koch takes the phrase "to balance the system" out of context. The tariff defines net revenues as monies received by Koch, less monies paid out, less *"the cost of gas purchased* to balance the system" (emphasis added). In other words, the tariff appears to contemplate that Koch's system will be balanced through an actual gas purchase, not through a mere accounting adjustment.

will be vacated as arbitrary and capricious. *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C.Cir.1995). In fact, however, the two cases were handled similarly; any differences between the two cases, as the Commission noted, "[did] not warrant a difference in outcome." *KGPC*, 77 F.E.R.C. ¶ 61,161, at 61,618. Williams Natural Gas Company ("WNG") was operating under a tariff provision similar to Koch's section 20.1(D). Like Koch, WNG had offset its refund obligation by an amount set aside for projected gas purchases. The company then stated that it found it unnecessary to make these purchases but requested that it be able to defer any obligation to adjust its records until a purchase was made. The Commission denied this request, noting that WNG's tariff contained no provision permitting it to net actual revenues received against projected future costs. *WNG*, 75 F.E.R.C. ¶ 61,040, at 61,127. It therefore directed WNG to refund its net revenues to its customers. Koch reads the Commission's decision to mean that WNG was granted one opportunity to defer its refund obligations, an opportunity Koch claims it was denied. But this is not the case: Both companies were permitted to offset their refund obligations in one reconciliation period[12] with the projected cost of gas purchases; once it was discovered in the next period that a gas purchase would not actually be made, the Commission required both companies to adjust their records and refund the net revenues to their customers. The Commission therefore did not act arbitrarily in interpreting Koch's tariff to require a return of net revenues at the end of each quarter or in determining that Koch's accounting methods violated its tariff.

■ This is not to say, however, that the Commission's choice of remedy for that violation—the ordering of a refund—was appropriate in Koch's case.[13] In general, we defer to FERC's decisions in remedial matters, respecting that " 'the difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion.' " *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C.Cir.1984) (quoting *Arizona Elec. Power Coop., Inc. v. FERC*, 631 F.2d 802, 809 (D.C.Cir.1980)). As a result, we do not ordinarily interfere with FERC's exercise of this discretion " 'so long as the agency's determination has a rational basis.' " *Id.* If, however, we conclude that FERC has failed to establish that its decision represents a "reasonable accommodation of the relevant factors" and that the refund is "equitable in the circumstances," *Laclede Gas Co. v. FERC*, 997 F.2d 936, 944 (D.C.Cir.1993) (internal quotes omitted), we must vacate FERC's action and remand for reconsideration. *See, e.g., Gulf Power Co. v. FERC*, 983 F.2d 1095 (D.C.Cir.1993) (court upholds FERC's interpretation of regulation but vacates penalty as arbitrary and capricious).[14]

■ We find that in this case, the Commission's decision to order a refund constituted an abuse of discretion. It is true that, given the language of its tariff and the problems it experienced in complying with that language, Koch should have informed the Commission of its difficulties and attempted to seek a resolution or revision of the tariff rather than proceeding blindly with an accounting adjustment not anticipated by its customers. The justification for requiring a filed tariff and for the filed rate doctrine—which prohibits regulated companies from charging rates that differ from those in its properly filed tariff, *see, e.g., Western Resources, Inc. v. FERC*, 72 F.3d 147, 149 (D.C.Cir.1995)—is to ensure that customers

---

12. WNG's reconciliation period was one year; Koch's, as interpreted by the Commission, was three months.

13. Because WNG is not a party to this action, we offer no opinion on the propriety of a refund in WNG's case.

14. In assessing the propriety of FERC's remedial orders, we have in past cases alluded both to an abuse of discretion standard of review, *see, e.g.,* *Columbia Gas*, 750 F.2d at 112; *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 233–34 (D.C.Cir.1986), and to an arbitrary and capricious standard, *see, e.g., Gulf Power*, 983 F.2d at 1102; *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1019 (D.C.Cir.1987). Because both standards, at least in the context of FERC's remedial authority, require FERC to have a rational basis for its actions, we see no reason to distinguish between them here.

can rely on a pipeline's compliance with its tariff in conducting their own business activities and thus "know in advance the consequences of the purchasing decisions they make." *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 577 (D.C.Cir.1990). As we noted in *Towns of Concord, Norwood & Wellesley, Massachusetts v. FERC,* 955 F.2d 67, 75 (D.C.Cir.1992), however, any assessment of the Commission's remedial actions must be "based upon a considered analysis of the facts of [the] case and the precise purposes of the filed rate doctrine." Koch's actions, even if technically violative of its tariff, did not truly implicate the doctrine's concerns.

To begin with, as counsel for the Commission acknowledged at oral argument, because Koch replaced the needed gas from its own reserves, it did not gain a windfall from its failure to refund the revenues in the cash-in/cash-out fund. As we noted in *Concord,* "[c]ustomer refunds are a form of equitable relief, akin to restitution, and the general rule is that agencies should order restitution only when money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." *Id.* (internal quotes omitted). The funds retained by Koch in this case were to be used to purchase replacement gas—and, indeed, they eventually were, as Koch's figures for 1996 bear out.

Moreover, it is not at all clear that a refund in this case would further the policy of the Commission as expressed in Order No. 636. The Order directed pipelines to establish mechanisms to deter abuses of the system—to discourage shippers from threatening pipeline integrity by under- or overdelivering. Koch's cash-in/cash-out system attempted to achieve this goal by passing on the costs of transportation imbalances to those shippers responsible for the shortfall. Issuing a refund in this case would work counter to Order No. 636's directive, in that a refund returns to those shippers who took additional gas from Koch the very amounts they were charged as a result of their miscalculations, leaving the pipeline's shareholders to swallow these costs. We cannot conclude that the Commission's discretion,

properly exercised, would encompass what would amount to a contravention of its stated policy for what was, in essence, a technical error.

We were presented with an analogous situation in *Gulf Power.* In response to rising coal prices, Gulf bought out its old coal contracts and entered into new ones, saving its customers approximately $4.3 million over the life of the contracts. Gulf then sought to pass on to its customers not only the savings realized but also the cost of the buyouts. FERC subsequently issued an order in another case declaring that although buyout costs could not automatically be passed on to customers under the applicable regulations (the "fuel adjustment clause" regulations), it would grant a waiver from the regulations if the utility could show that the buyout provided "ongoing benefits" to its customers. *Gulf Power,* 983 F.2d at 1097. Despite this notice, Gulf continued to pass on its costs and did not request a waiver until FERC discovered, after a routine audit, that Gulf had failed to seek one. Although FERC eventually granted Gulf's waiver request, it declined to grant the waiver retroactively. It thus ordered Gulf to refund, with interest, the buyout costs it had previously charged its customers, a total of $2.7 million.

Although we agreed with FERC that Gulf "committed at least a ministerial error" in failing to seek either a waiver or guidance from FERC, we found the refund order to be "wholly disproportionate to the error Gulf committed." *Id.* at 1098. FERC's order, we noted, disregarded several important considerations. To begin with, Gulf received no windfall by passing on the costs; rather, it recovered only those costs incurred to produce a benefit for its customers. *Id.* at 1100. FERC's order, by contrast, "forced Gulf to give its customers a windfall refund ... in addition to the savings it had already provided them through reduced rates." *Id.* at 1101. Moreover, FERC failed to explain why it had ordered a refund in Gulf's case but had declined to do so in other cases. *Id.* at 1100. And finally, we noted that FERC had failed to consider alternative remedies, such as civil penalties. *Id.* at 1101. We thus vacated FERC's denial of Gulf's retroactive

waiver request and remanded for reconsideration.

Given the affinity between Gulf's and Koch's situations, we are persuaded to issue a similar directive in this case. Although Koch, like Gulf, erred in forging ahead without seeking the Commission's guidance,[15] that error did not justify a $3 million refund. As in *Gulf Power*, the Commission failed to consider that Koch received no windfall as a result of its actions. If Koch is required to issue a refund in this case, thus diminishing the purchase funds available, Koch's shareholders, rather than the shippers, will ultimately bear the burden of replenishing Koch's gas reserves.

Moreover, although the Commission acted consistent with its decision in *Williams Natural Gas* in ordering a refund, it failed to distinguish these cases from the *Gulf Power*-type cases, in which FERC, on remand, waived strict compliance with its regulations given the absence of harm suffered by the utilities' customers. *See, e.g., Central Ill. Pub. Serv. Co. v. FERC*, 941 F.2d 622 (7th Cir.1991) (court upholds FERC's interpretation of regulation governing recovery of litigation expenses but vacates refund and remands for reconsideration), *on remand*, 58 F.E.R.C. ¶ 61,186 (1992); *Minnesota Power & Light Co. v. FERC*, 852 F.2d 1070 (8th Cir.1988) (same), *on remand*, 45 F.E.R.C. ¶ 61,369 (1988). Significantly, after our decision in *Gulf Power*, FERC modified its policy to provide for a case-by-case analysis of the propriety of a refund when a utility violated the fuel adjustment clause. *See Western Resources, Inc.*, 65 F.E.R.C. ¶ 61,271 (1993).[16] This precedent requires a better explanation for the Commission's refund order than it provided in Koch's case.

In remanding this case, we note particularly that Koch's tariff is still undergoing revisions in response to the Commission's 1996 decision. This, we think, reflects the view of all parties—including Koch's customers, who have continued to offer comments on Koch's proposed revisions—that determining the best method of addressing Order No. 636's concerns about system abuses is a difficult process. A particular proposal that appears appropriate in theory may reveal itself, as it did in Koch's case, to be inadequate in practice. Even the Commission itself acknowledged during its proceedings on Koch's tariff that the revisions were something of a work in progress:

> We find that it is in the best interests of all parties that KGPC have a final restructuring plan in place, and to continue to make minor adjustments and readjustments to the operating provisions, based on speculation as to problems that might arise, is contrary to that goal. It may very well be that the plan is not perfect and that as the pipeline and its customers gain experience operating in the restructured environment, additional fine-tuning of the procedures may be necessary. The Commission will make those adjustments at that time.

*Koch Gateway Pipeline Co.*, 66 F.E.R.C. ¶ 61,232, at 61,547 (1994). In subsequent proceedings before the Commission, Koch has, for example, been permitted to alter its tariff so that it is required to reconcile and refund net revenues on an annual, rather than on a quarterly, basis. *See, e.g., Koch Gateway Pipeline Co.*, 80 F.E.R.C. ¶ 61,005 (1997); *Koch Gateway Pipeline Co.*, 79 F.E.R.C. ¶ 61,127 (1997); *Koch Gateway Pipeline Co.*, 77 F.E.R.C. ¶ 61,332 (1996). We trust that this change will aid Koch in resolving the problems it has experienced in administering its system and is representa-

---

**15.** The Commission's decision in *Williams Natural Gas* was issued on April 10, 1996, one day before Koch filed its first report with the Commission. Although it might be unrealistic to suggest that Koch should have been aware of the Commission's decision at the time it filed its report, it is not irrational to say that Koch should have acknowledged the order's import by the time it filed its supplemental report on July 2, 1996.

**16.** The Commission noted that it would be guided by "whether the Commission has: (1) allowed, (2) rejected, or (3) not ruled on fuel adjustment clause recovery for the cost in question" as well as "whether the customers: (1) enjoyed savings, or (2) suffered losses from the utility's unilateral action." 65 F.E.R.C. ¶ 61,271, at 62,252. Applying these standards to Western Resources, the Commission ordered the utility to refund only the interest it had accumulated on the funds recovered from its customers. *Id.*

tive of the Commission's willingness to engage in "additional finetuning." Given the Commission's flexible approach throughout these later proceedings, its refund order was an inappropriate response to Koch's first report on the implementation of its revised tariff.

### III. CONCLUSION

Although we find that the Commission did not act arbitrarily in concluding that Koch violated the terms of its tariff, we hold that the Commission abused its discretion in ordering Koch to refund over $3 million to its transportation customers as a remedy for this violation. We therefore grant Koch's petition for review, vacate the Commission's decision as to the refund, and remand to the Commission for reconsideration.

*It is so ordered.*