# United States Court of Appeals
## For the First Circuit

Nos. 06-1658, 06-2054

TOWN OF NORWOOD, MASSACHUSETTS,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

_____

NEW ENGLAND POWER COMPANY,

Intervenor.

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

Before
Boudin, Chief Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

Robert A. Jablon with whom Elaine C. Lippmann, Spiegel &
McDiarmid, Charles F. Wheatley, Jr., Wheatley & Ranquist, P.A., J.
Owen Todd, Juliet A. Davison, Heidi A. Nadel and Todd & Weld LLP
were on consolidated brief for petitioner.
Michael E. Kaufmann with whom John S. Moot, General Counsel,
and Robert H. Solomon, Solicitor, Federal Energy Regulatory
Commission, were on consolidated brief for respondent.
Kenneth G. Jaffe with whom Alston & Bird LLP, and John F.
Sherman III, Deputy General Counsel, National Grid USA Services
Company, Inc., were on brief for intervenor.

February 2, 2007

**BOUDIN, <u>Chief Judge</u>.** The Town of Norwood, Massachusetts ("Norwood"), which operates a municipal electric system serving local businesses and residents, seeks review of an order of the Federal Energy Regulatory Commission ("FERC"). The order sustained a contract termination charge contained in a tariff previously filed by New England Power Company ("NEPCO"). The background events have been the subject of prior litigation in this court, principally in <u>Town of Norwood</u> v. <u>FERC</u> ("<u>Norwood I</u>"), 202 F.3d 392 (1st Cir.), <u>cert. denied</u>, 531 U.S. 818 (2000).

For many years, NEPCO was a major power wholesaler in New England. It operated generating plants and a transmission network, and sold power wholesale to affiliated distribution companies (such as Massachusetts Electric Company, which served Massachusetts, and Narragansett Electric Company, which served Rhode Island) as well as to non-affiliated distributors like Norwood. Service to Norwood was provided under a long-term requirements contract of a kind then common in the utilities industry.

The contract, which began in 1983 and thereafter was extended by Norwood until October 2008, required NEPCO to supply, and Norwood to purchase, Norwood's power requirements from NEPCO at rates provided by NEPCO's Tariff No. 1. The contract could be terminated by Norwood without penalty but only upon seven years' prior notice. The present litigation arises out of NEPCO's action

in providing, and Norwood's decision to exercise, a new option permitting customers to terminate their contracts early.

Beginning in late 1996, in response to legislative and regulatory initiatives to promote competition and consumer choice in the electric power industry, NEPCO made a series of regulatory filings. Among these were settlements offered by NEPCO to NEPCO's distributor customers--both affiliates and non-affiliates (including Norwood)--permitting them to terminate their NEPCO requirements contracts earlier than otherwise permitted, upon payment of a contract termination charge.

The aim was to allow distributors flexibility to choose new suppliers while permitting NEPCO to recover its "stranded costs"--that is, investments made by NEPCO to meet the projected long-term requirements of its distributor customers.[1] The proposed settlement terms also provided that NEPCO would offer its affiliates, but not Norwood, low (but gradually escalating) "wholesale standard offer" rates for power without the need for a contract; the affiliates were required to offer corresponding retail standard offer rates to their retail customers, but Norwood, as a municipal utility, was not. Mass. Gen. Laws ch. 164, § 47A.

_____

[1]See Norwood I, 202 F.3d at 399. See also Order No. 888, Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21,540, 21,628 (1996) (rule codified as revised at 18 C.F.R. pts. 35 & 385).

Additionally, as part of its restructuring, NEPCO sought approval from FERC to sell virtually all of its non-nuclear generating facilities. The buyer, USGen New England, Inc., agreed to assume responsibility for providing the "wholesale standard offer" service to NEPCO's affiliates who terminated, and agreed not to raise rates for NEPCO's remaining distributor customers, including Norwood. New Eng. Power Co., 82 F.E.R.C. ¶ 61,179, at 61,658-60 (1998) ("New Eng. Power VII"), reh'g denied, 83 F.E.R.C. ¶ 61,275 (1998) ("New Eng. Power VIII").

FERC approved the settlement offers and divestiture over Norwood's objection.[2] NEPCO's three affiliated customers and three of its unaffiliated municipal customers opted to accept NEPCO's settlement offer, to terminate early, and to pay the contract termination charge. Other non-affiliates opted to continue to purchase their power requirements from NEPCO at Tariff No. 1 rates through the contractual seven-year notice period for termination.

Norwood was unwilling to take either course of action. It did not want to continue buying power at Tariff No. 1 rates when its distributor "competitors" had been offered lower non-contract

---

[2]See New Eng. Power Co., 78 F.E.R.C. ¶ 61,080 (1997) ("New Eng. Power I"); New Eng. Power Co., 80 F.E.R.C. ¶ 63,003 (1997) ("New Eng. Power II"); New Eng. Power Co., 81 F.E.R.C. ¶ 61,281 (1997) ("New Eng. Power III"), reh'g denied, 83 F.E.R.C. ¶ 61,265 (1998) ("New Eng. Power IV"); New Eng. Power VII, 82 F.E.R.C. at 61,656. See also New Eng. Power, 83 F.E.R.C. ¶ 61,085 (1998) ("New Eng. Power V"); New Eng. Power Co., 81 F.E.R.C. ¶ 61,334 (1997) ("New Eng. Power VI").

rates; it viewed such an arrangement as discriminatory. Nor did it want to pay a contract termination charge for NEPCO's stranded costs; because it purchased its transmission services from Boston Edison, not NEPCO, it fell outside the stranded cost obligations imposed by FERC under Order No. 888.[3]

Instead, Norwood notified NEPCO on March 4, 1998, that on April 1 it would unilaterally terminate its contract with NEPCO--without giving the required seven years' notice--and switch to a different power supplier. NEPCO then filed a tariff amendment to its Tariff No. 1 permitting any of its remaining distributor customers, including Norwood, to terminate their requirements contracts on thirty days' notice upon the payment of a contract termination charge ("CTC") whose formula was specified in the tariff amendment. Norwood I, 202 F.3d at 397.

This CTC was calculated using a formula that would enable NEPCO to recover the revenues that it would have collected had a terminating customer continued to pay the tariff rate then in effect through the end of the contract term. The CTC equaled the number of years remaining on the contract (L) multiplied by the difference between the expected annual revenue from the terminating

_____

[3]Order No. 888 obligated power companies to transmit ("wheel") power for customers which had purchased both power and transmission services from a single company, but who now wished to purchase power from another provider; and it obligated such customers to compensate for any resulting stranded costs. Because Norwood had bought power but not transmission services from NEPCO, it fell outside the terms of Order No. 888. Norwood I, 202 F.3d at 398-99.

customer based on the rates in effect at the time of termination $(R)$[4] and the estimated market value of the released capacity $(M)$; that is, $CTC = L \times (R - M)$. The CTC was capped so as not to exceed the terminating customer's contribution to NEPCO's fixed power supply costs; the tariff defined that contribution as L multiplied by the difference between R and NEPCO's annual average fuel costs with respect to the customer.

This CTC was in several respects less favorable than the contract termination charge applied to settling customers: it did not provide the terminating customer a credit for the recovery of costs associated with NEPCO's business, for example, through the profitable divestiture of generating plants; and it did not update ("true-up") the formula values to reflect actual, rather than projected, market values for released capacity. New Eng. Power Co., 83 F.E.R.C. ¶ 61,174, at 61,723 nn.5, 13 (1998) ("New Eng. Power IX"), reh'g denied, 84 F.E.R.C. ¶ 61,175 (1998) ("New Eng. Power X"); New Eng. Power V, 83 F.E.R.C. at 61,419 n.5.

_____

[4]More precisely, R was to equal Total Revenue minus Transmission Revenue. Total Revenue was to "equal the annual average of revenues received by [NEPCO] from [the terminating customer] over three years under the presently effective rates . . . In the event that the rates paid by the Customer . . . [had] changed during the three-year period, Total Revenue shall be determined using the Customer's revenue for the 12 months" preceding termination. Transmission Revenue referred to the annual average revenue credited to the customer for transmission services performed by a third party. The focus of this appeal is on the Total Revenue component of the R value.

In proceedings before FERC, Norwood objected to the tariff amendment on a number of grounds, including claims that it violated the "stranded cost recovery" provisions of FERC Order No. 888, and that the disparities between the CTC offered to Norwood and the CTC offered to settling customers constituted an "undue preference" in violation of the Federal Power Act.  16 U.S.C. § 824d(b) (1994).  Norwood also sought an evidentiary hearing on the reasonableness of the CTC amount (which it estimated at $78 million).  Norwood I, 202 F.3d at 401.

FERC rejected Norwood's claims, found the tariff amendment to be "reasonable," New Eng. Power IX, 83 F.E.R.C. at 61,723, and on rehearing refused to provide an evidentiary hearing because "no party [had] raised any issue of material fact."  New Eng. Power X, 84 F.E.R.C. at 61,920.  FERC noted that Norwood could file a section 206 complaint[5] arguing that the underlying contract was no longer reasonable and that Norwood should be able to break it without paying the amounts owed under it.  New Eng. Power IX, 83 F.E.R.C. at 61,724.

_____

[5]Section 206 of the Federal Power Act, 16 U.S.C. § 824e, provides a procedure for filing a complaint with the Commission that a "rate [or] charge . . . charged . . . by any public utility . . . is unjust, unreasonable, unduly discriminatory or preferential."  If after a hearing the Commission agrees, it "shall determine the just and reasonable rate [or] charge . . . to be thereafter observed and in force, and shall fix the same by order."

Norwood I affirmed FERC's decision, holding inter alia that Order No. 888 did not by its terms apply to Norwood, 202 F.3d at 399, and that the disparity between Norwood's CTC and the contract termination charge of settling customers did not constitute an "undue preference." Id. at 402. At several points Norwood's present appeal appears to attempt to relitigate these two issues, but in these respects it is foreclosed by our prior adjudication. Springfield Television Corp. v. FCC, 609 F.2d 1014, 1019 (1st Cir. 1979).

We also upheld the CTC formula as designed "to cover certain projected losses to New England Power caused by not supplying electricity after preparing to do so, calculated based on rates already approved by FERC" and said that Norwood had failed to show any factual dispute requiring an evidentiary hearing. Norwood I, 202 F.3d at 401. However, we left open the possibility that Norwood could file a section 206 complaint "challenging the substance of the contract termination charge." Id.[6]

Norwood declined to pay the termination charge and, faced with state court proceedings to recover amounts due under the contract, Norwood filed a section 206 complaint with FERC in 2002, alleging (among other things) that NEPCO erroneously calculated the

[6]In a companion case, Norwood alleged a breach of contract and antitrust violation by NEPCO. We affirmed the district court's dismissal of these claims, except for one antitrust claim that we remanded. Town of Norwood v. New Eng. Power Co. ("Norwood II"), 202 F.3d 408 (1st Cir.), cert. denied, 531 U.S. 818 (2000).

-8-

CTC and CTC cap by relying on incorrect R and M values.  In particular, Norwood claimed that the R value should have been reduced to reflect NEPCO's profitable divestiture of its non-nuclear generating plants, that the M value should have been "trued-up" to reflect actual, post-termination market values, and that these omissions were unreasonable under section 206.

The Commission set Norwood's claims for a hearing, saying that it had "accepted NEPCO's CTC formula, but ha[d] not accepted the individual components of the CTC calculation." Town of Norwood v. Nat'l Grid USA, 104 F.E.R.C. ¶ 61,030, at 61,074 (2003) ("Nat'l Grid I").  Before the ALJ, Norwood also argued belatedly that the interest rate of 18 percent applied by NEPCO to overdue CTC payments was contrary to the tariff amendment and, since the rate was in excess of NEPCO's cost of money, "unjust [and] unreasonable."  16 U.S.C. § 824e.

The ALJ accepted Norwood's argument that it should get a reduction in the R value figure to reflect the non-nuclear plant divestitures[7] but rejected its other claims.  On review, the Commission reversed the ALJ as to the credit for plant divestitures, ruling (1) that the language of the CTC formula did

---

[7]The ALJ held that the CTC formula could be read to suggest that the preceding twelve months' revenue was simply a "starting point" in fixing the R value (see note 4, above), and that a downward adjustment--in the amount of a 28 percent of R--should be made to "reflect divestiture sales that were known and measurable" at the time the CTC was calculated. Town of Norwood v. Nat'l Grid USA, 107 F.E.R.C. ¶ 63,041, at 65,191 (2004) ("Nat'l Grid II").

-9-

not provide for an adjustment for divestiture of assets, and (2) that the disparity between the CTC formula applied to Norwood and the contract termination charge offered to settling customers was not an undue preference because the parties were not similarly situated.[8]  The Commission did not directly address Norwood's argument that the formula was unreasonable in failing to provide a credit for plant divestitures.

On the interest rate issue, the Commission in its initial decision rejected the ALJ's ruling in NEPCO's favor, instead siding with Norwood.  Nat'l Grid III, 112 F.E.R.C. at 61,637-38.  On rehearing, it reversed itself and sided with NEPCO.[9]  FERC also reaffirmed its holding in favor of NEPCO on the R and M values.  Nat'l Grid IV, 114 F.E.R.C. at 61,633-34.  The Commission thereafter denied Norwood's request for further rehearing on the interest rate issue.  Nat'l Grid V, 115 F.E.R.C. at 62,552.  This appeal followed.

We begin by considering Norwood's arguments concerning the R and M values.  To the extent that Norwood purports to interpret the language of the CTC tariff amendment as requiring

---

[8]Town of Norwood v. Nat'l Grid USA, 112 F.E.R.C. ¶ 61,099, at 61,629 (2005) ("Nat'l Grid III"), modified on reh'g, 114 F.E.R.C. ¶ 61,187 (2006) ("Nat'l Grid IV"), further reh'g denied, 115 F.E.R.C. ¶ 61,396 (2006) ("Nat'l Grid V").

[9]The Commission said that it had misread the tariff in its initial decision, and that the tariff incorporated an 18 percent rate on overdue payments.  Nat'l Grid IV, 114 F.E.R.C. at 61,636.

credit for divestiture of assets and true-ups, its arguments are properly before us but fail on the merits. The CTC provides for certain kinds of credit adjustments to R, including for transmission services provided by third parties, but nowhere mentions credit for divestiture of assets. The CTC was clearly intended as a formula--not, as the staff urged, merely as "a starting point." Nat'l Grid II, 107 F.E.R.C. at 65,191.

Norwood says that such a credit was implicitly intended because the CTC was modeled on the contract termination charge-formula approved in Order No. 888 and offered to settling customers, which provided credit for asset divestiture. But when FERC approved the CTC tariff amendment, it expressly noted that "[t]he proposed formula . . . differs from that applicable to other wholesale power customers." New Eng. Power IX, 83 F.E.R.C. at 61,723 nn.5, 13.

Nor does the CTC anywhere indicate that the M values will be trued-up; quite to the contrary, the letter accompanying the tariff states that, although NEPCO planned to periodically update the estimates of market value provided in the tariff, "[a]ny updated estimates . . . would not affect the contract termination charges payable by a customer that exercised the early termination

charge prior to the filing of the update."[10]   In short, the CTC tariff language is clear and adverse to Norwood.

However, the main thrust of Norwood's position on appeal is that the CTC formula, as FERC reads it, is unlawful under the statute.  Norwood argues that, because the formula fails to account for the divestiture of assets or to incorporate trued-up market values for power, it is not cost-based--that is, the CTC would give NEPCO more than it needs to recover any losses incurred by not supplying power to Norwood after preparing to do so; and that the CTC is therefore "unjust [and] unreasonable."  16 U.S.C. § 824e.

As we have noted, the Commission did not address these unreasonableness claims on the merits.  Its position is that Norwood cannot now raise them because the reasonableness of the CTC formula--as opposed to its application--is res judicata. Although the Commission would likely prevail on the merits, this would likely require a remand and further proceedings.  We agree that they need not be reached because Norwood's attacks on the reasonableness of the formula are foreclosed.

_____

[10]Norwood also appears to argue that FERC erred in accepting NEPCO's market estimates, which, Norwood asserts, were too low. But we defer to the Commission and ALJ's reasoned explanation as to why NEPCO's market estimates were just and reasonable: the market prices in NEPCO's forecast were close to--and indeed slightly higher than--the prices in Norwood's contract with its new power supplier, the prices Norwood was offered by another power supplier, and the prices in Norwood's offer to continue buying power from NEPCO. Nat'l Grid III, 112 F.E.R.C. at 61,633; Nat'l Grid II, 107 F.E.R.C. at 65,187-91.

Over seven years ago, the Commission pronounced the CTC formula to be "reasonable" despite the fact that it failed to provide for any adjustments for asset divestiture or true-ups. New Eng. Power IX, 83 F.E.R.C. at 61,723 & nn.5, 13. Norwood sought review of the FERC decision in Norwood I; but on appeal Norwood developed only its discrimination claim and a different unreasonableness argument but not the unreasonableness arguments concerning R and M that it now makes.

To permit Norwood now to advance new (and previously available) theories in opposition to an already-litigated tariff amendment would frustrate the values of repose and efficiency that res judicata doctrine is meant to protect. Univ. of Tenn. v. Elliott, 478 U.S. 788, 798 (1986). Res judicata does not merely prevent re-litigation of issues actually decided but also the presentation of new grounds that could and should have been raised when the same transaction was the subject of earlier, different attacks. Restatement (Second) of Judgments § 24 (1982).

Generally speaking, such res judicata doctrine applies to agencies when they are acting in an adjudicative capacity to resolve a controversy between two parties. Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992), cert. denied, 507 U.S. 973 (1993). Here and in the prior proceeding in which Norwood sought rejection of the CTC tariff, the parties are the same and, so far as Norwood contests the validity of the CTC formula, the

subject matter is the same. The first proceeding resolved the reasonableness issue in what was effectively a final judgment; attacks not properly developed there cannot now be resurrected.[11]

Norwood says that when we sustained FERC in Norwood I, we expressly left open to Norwood a section 206 challenge to "the substance of the contract termination charge," adding that "[i]f these charges were miscomputed or unsupported, Norwood might well have a legitimate objection." 202 F.3d at 401. When setting for hearing the claim currently on appeal, FERC agreed that it had "not [yet] approved the individual components used in NEPCO's calculation" of the CTC. Nat'l Grid I, 104 F.E.R.C. at 61,074.

But what was left open by these statements was the proper computation of the R and M values according to the formula--not new attacks on the formula itself. Norwood, quoting the FERC staff, says that the prior reservation could not have meant only to "giv[e] Norwood a chance to challenge NEPCO's arithmetic." But whether the figures proffered by NEPCO complied with the formula mattered a good deal and Norwood itself did urge that NEPCO had employed unreasonable estimates of the market value of the released

_____

[11]For these reasons, we also reject Norwood's arguments concerning the CTC cap. Norwood claims that it cannot be required to "contribut[e] to . . . fixed power supply costs" for facilities that NEPCO has since profitably divested. But the CTC cap, like the CTC generally, is a formula incorporating values determined at the time of termination: it is equal to R minus NEPCO's average fuel costs with respect to Norwood. Norwood does not contest on appeal the calculation of NEPCO's average fuel costs; it does contest R, but this challenge is dealt with above.

load and had miscalculated its fixed power supply costs in determining the CTC cap.

Norwood says that rate orders are not subject to the rules of res judicata: a rate that was once reasonable may, in light of changed circumstances, become unreasonable. Tesoro Alaska Petroleum Co. v. FERC, 234 F.3d 1286, 1290 (D.C. Cir. 2000). But the CTC is not a rate; it is "a formula-driven charge . . . calculated based on rates already approved by FERC," Norwood I, 202 F.3d at 401, payment of which permitted Norwood to opt out of a contract before it had run its course. The charge became a fixed and final contractual obligation at the time of termination.

Norwood counters that the CTC, if not itself a rate, incorporated rates that should be open to challenge as unreasonably high. But there is nothing in the statute or case law cited by Norwood that prevents the construction of termination charge based on rates in effect as of a certain date. Creating a fixed and knowable obligation had advantages and disadvantages for Norwood in choosing whether to terminate; but the terms of the CTC were clear when it made its decision.

In effect, NEPCO bore the risk of higher costs and lower market prices than the CTC incorporated, and Norwood bore the risk of lower costs and higher market prices. Norwood was free to argue, in its original CTC challenge, that the tariff rates to be incorporated by the CTC were unreasonably high in light of what was

known then about NEPCO's costs; but Norwood chose not to do so. Norwood was also free to terminate and contest the CTC terms as unlawful--which it did, albeit unsuccessfully. What it could not do was to defer some of the available attacks on the CTC formula and now raise them in court for the first time eight years later.

Indeed, if we were to permit this kind of hide and seek litigation tactic, nothing would prevent Norwood from filing tomorrow a new section 206 attack to present new arguments as to why the original CTC formula was unlawful. Norwood has managed to defer making the full installment payments for years. It is now faced with large past-due obligations; but the obligations are ones easily foreseen, have been enlarged by delays in payment and are the product of Norwood's own choices.

Norwood would not likely have prevailed even if the merits were open. The reasonableness of NEPCO's approach in excluding true-ups and future plant divestitures is a regulatory issue within the province of FERC and reviewed by a court only for arbitrariness. Cent. Maine Power Co. v. FERC, 252 F.3d 34, 40 n.3 (1st Cir. 2001). There is nothing obviously unreasonable about framing a charge for contract termination that approximates, as of the time of termination, projected revenues promised by the buyer less projected avoided loss for the seller.

This brings us to the important issue of the interest rate. In December 1998, after FERC's 1998 order approving the CTC,

NEPCO brought a breach of contract action against Norwood in Massachusetts state court, seeking to collect then-overdue CTC payments and late payment charges. In March 2001, the Massachusetts trial court granted NEPCO's summary judgment motion and awarded it $27,149,054.08, equal to the CTC and late payment charges due through January 31, 2001.[12]

In October 2003, the Appeals Court affirmed, noting specifically that "[w]e have . . . considered Norwood's arguments with respect to . . . the inclusion of an improper interest rate in the calculation and conclude that they lack merit." New Eng. Power, 797 N.E.2d 26, at *2. But it thereafter remanded, directing the trial court to conform to the FERC order that is the subject of this appeal, "or to any further modifications of that order by FERC." New Eng. Power, 847 N.E.2d 366, at *2. So the matter turns on FERC's ultimate determination.

We turn, therefore, to Norwood's claims regarding the interest rate for late payment of the CTC installments, which are two: one is that FERC misconstrued the tariff and that it is entitled under the tariff to pay a lower interest rate than the 18 percent ordered by FERC; the other is that the 18 percent rate is

_____

[12]New Eng. Power Co. v. Town of Norwood, No. 982650A, 2001 WL 543172 (Mass. Super. Ct. Mar. 14, 2001), aff'd, 797 N.E.2d 26, at *2 (Mass. App. Ct. 2003) (unpublished), review denied, 440 Mass. 1108 (2003), cert. denied, 541 U.S. 1073 (2004), amended, 847 N.E.2d 366 (Mass. App. Ct. 2006) (unpublished).

-17-

unlawful or at least inconsistent with prior Commission precedent. We treat the two issues in that order.

NEPCO has in its successive unpaid bills to Norwood applied an 18 percent interest rate to Norwood's <u>overdue</u> CTC payments, citing Section J of Tariff No. 1's schedule of general terms and conditions:

> When all or part of any bill shall remain unpaid for more than thirty (30) days after the rendering thereof by the Company, interest at the rate of 1½% per month shall accrue to the Company from and after the rendering of said bill . . . .

Norwood first argues that the Section J rate is inapplicable to late CTC payments. Instead, it claims that section N applies; Section N was added to the tariff as part of the amendment permitting early termination of contracts under the formula we have been discussing. It states:

> The Contract Termination Charge shall be payable in equal monthly installments of principal and interest . . . The Customer's payments shall include carrying charges on the unpaid amount of the Contract Termination Charge at the interest rate determined pursuant to section 35.19a of the Commission's regulations (18 C.F.R. 35.19a) effective on the Early Termination Date and compounded monthly.

Although the termination charge was to be calculated at the time of termination, section N permitted its payment in installments over the remaining life of the contract and imposed, as "the carrying charge" (that is, interest) on the deferred

payments, an interest rate specified in FERC regulations.[13]  18 C.F.R. § 35.19a.  The cited regulations provided that, for refunds by carriers to customers where new rates had gone into effect but were later disallowed, the Federal Reserve prime interest rate applied.

The prime rate varies over time, but it has in recent years been considerably less than 18 percent.  Norwood claimed in the Commission proceeding that the prime rate (varying over time), rather than the 18 percent rate, should be applied to its unpaid CTC bills.  The Commission, after initially agreeing, ultimately held that the prime rate regulation did not apply and that the 18 percent rate in section J did.  See note 9, above.

We think the question is close.  The phrase "unpaid amount" in Section N could be read to include both unbilled CTC amounts and amounts billed but as yet unpaid (e.g., overdue payments).  But the Commission is entitled to deference in interpreting tariffs filed with it, Koch Gateway Pipeline Co. v. FERC, 136 F.3d 810, 814 (D.C. Cir. 1998); the CTC is part of the tariff; and FERC's construction is reasonable, even though not inevitable, as we now explain.

---

[13]NEPCO further explains that the monthly installments are calculated by (a) calculating the present discounted value of the total CTC amount using the section 35.19a rate and then (b) converting that lump sum into monthly installment payments that incorporate a carrying charge equal to the section 35.19a rate.

Section N can easily be read to apply the prime rate only in calculating the installment amount due each month from the buyer who terminated, remaining silent as to the interest rate charged to <u>overdue</u> monthly installment payments.  The fact that the carrying cost language is juxtaposed with the option to pay in installments supports this reading.  And, if Section J is read as a catchall provision directed to all late payments, there would be no reason to address that subject in section N.

By contrast, Section J--which imposes an 18 percent interest rate on late payments--applies to "any bill"; and Norwood's monthly installment obligation is the subject of a "bill."  Norwood argues that Section J applies only to bills for electricity sales, pointing to the fact that Section J defines a "month" as "the period between two meter readings . . . ."  But the fact that the provision applies to metered sales does not exclude its application to other bills as well.

Norwood suggests that it is inconsistent to use two different interest rates, but interest rates reflect policy choices and the overdue payment context is not the same as the installment payment context.  In particular, the prime rate can be viewed as a surrogate for the carrier's cost of money (although only very approximately); an 18 percent rate on overdue bills is, in recent years, considerably more than the carrier's cost of money and

justifiable primarily to offset collection costs and encourage prompt payment.

This takes us directly to Norwood's alternative argument, namely, that if the tariff does impose an 18 percent rate on overdue CTC payments, it is unreasonable because such a rate is in excess of NEPCO's cost of money. Taken in the abstract, this would be unpersuasive: deterring delayed payments is a legitimate purpose, quite apart from collection costs, and nothing in the statute prevents the Commission from treating a penalty as reasonable. If the Commission had said this and had no inconsistent precedent, that would be the end of the matter.

But Norwood's case is somewhat stronger because in Connecticut Light & Power Co., 59 F.P.C. 811 (1977), FERC itself rejected a proposed 18 percent annual charge on late payments as "not supported by cost data." Id. at 821. The decision said that a late payment penalty might be warranted in cases of chronic delinquency, but in general "we do not believe as a matter of policy that this Commission should assume the functions of a bill collection enforcement agency except in otherwise hopeless situations." Id. See also Pub. Serv. Co. of N.M. v. FERC, 832 F.2d 1201 (10th Cir. 1987).

In its order, the Commission distinguished Connecticut Light & Power on the ground that it involved a proposed penalty interest rate, so that the power company bore the burden of showing

it to be reasonable; here, by contrast, the 18 percent rate had been part of the tariff since the mid-1970s, so Norwood bore the burden of showing it to be unreasonable. And, says the Commission, Norwood never offered cost evidence or other facts to show that the provision was unreasonable. Nat'l Grid V, 115 F.E.R.C. at 62,551-52.

We do not find this a persuasive explanation. NEPCO does not seriously suggest that 18 percent represents its cost of money. So the real question is whether the Commission has altered its Connecticut Light & Power policy--which it could do with an explanation, Atchison, Topeka & Sante Fe R.R. v. Witchita Bd. of Trade, 412 U.S. 800, 808 (1973)--or thinks that there is something about Norwood's situation that justifies such a penalty even though prior precedent would not allow it for an ordinary overdue bill, absent special circumstances.

Frankly, the Commission--with some reason--appears merely to have run out of patience with Norwood's attempts to re-litigate issues that it earlier lost or forfeit. In fact, even the interest rate issue was raised belatedly; but the state court judgment no longer poses a res judicata objection and the Commission itself chose to address the objection on the merits. Having chosen to decide the issue, the Commission must face it squarely and adequately resolve it.

On remand the Commission is not limited to a single choice. Conceivably it could sustain the 18 percent figure against attack and modify its Connecticut Light and Power policy (or adequately distinguish it). Or it might find the 18 percent figure unreasonable and find the prime rate or some other rate above the prime rate to be appropriate. We do agree that this remains a section 206 proceeding in which Norwood is attacking a longstanding tariff provision and bears the ultimate burden of proof.

We address one other loose end as to interest. Norwood has also argued that even if the 18 percent rate is applicable to CTC late payments, the rate should not be applied to payments due prior to FERC's order of February 22, 2006, since before that point the CTC amount had not been determined. It is true that the CTC amount had been in dispute and in that sense had not yet been finally determined by the Commission.

But section J makes it quite clear that, when a customer disputes an amount billed by a carrier, the carrier is entitled to prescribed interest that accrues "from . . . the rendering of said bill" on "the amount finally determined to be due and payable." Norwood has challenged the amount of interest prescribed; but whatever the figure FERC finds justified, the tariff provides that Norwood owes that amount from the time the bill was rendered.

We affirm the Commission's order insofar as it determines the amount of principal due; as to the interest, we also affirm the

-23-

order insofar as it requires interest payments based on at least the prime rate--the figure Norwood itself seeks--and remand only as to whether more is properly due.  Our stay order of August 21, 2006, will terminate when the mandate issues.  Each party will bear its own costs in this court.

<u>Affirmed in part and remanded in part</u>.